# REPORT OF THE SPECIAL SUBCOMMITTEE TO THE AMERICAN CENTURY WORLD MUTUAL FUNDS, INC. BOARD OF DIRECTORS

## THE *GOMES* DEMAND FINDINGS AND RECOMMENDATIONS

**December 1, 2014**

# TABLE OF CONTENTS

I. Executive Summary ...........................................................................................................1

II. History and Background of the Demand ........................................................................5

    A. Procedural History ...................................................................................................5

    B. Prior Judicial Review of Mr. Gomes' Claims.......................................................5

    C. American Century Entities and Parties Identified in the Complaint.........................6

III. Special Subcommittee .......................................................................................................7

    A. Formation of the Special Subcommittee...................................................................7

    B. Members of the Special Subcommittee ...................................................................8

    C. Special Subcommittee's Independence....................................................................8

    D. Compensation .........................................................................................................12

    E. Selection of Counsel ..............................................................................................12

IV. Investigation Process .......................................................................................................14

    A. Overview ................................................................................................................14

    B. Meeting with Mr. Gomes' Counsel .......................................................................14

    C. Documents Reviewed .............................................................................................15

    D. Interviews................................................................................................................18

    E. Case Law Review ...................................................................................................21

    F. Special Subcommittee Meetings............................................................................22

    G. Creation of Chronology .........................................................................................23

V. Factual Findings................................................................................................................23

    A. International Discovery............................................................................................23

B.  History of International Discovery's Investments in Neteller and bwin ..................24

C.  The Value of Investments in Neteller and bwin
Compared with the Fund's Overall Value ................................................26

D.  Net Gains/Losses on Investments ...........................................................27

E.  International Discovery's Overall Performance During 2005 and 2006 ..................27

F.  ACWMF Board's Role in International Discovery's Operations.............................28

G.  ACWMF Board's Exposure to International Discovery, Neteller, and bwin ...........29

H.  Decision to Purchase and Sell Neteller and bwin ......................................31

VI. Issues Addressed ....................................................................................32

VII. Findings and Recommendations ....................................................................33

A.  Preliminary Note Regarding Neteller ....................................................33

B.  Issue One: At the Time International Discovery Invested
in bwin, Was bwin Violating Any U.S. Laws?.........................................34

C.  Issue Two: Did International Discovery Violate
18 U.S.C. Section 1955 by Investing in bwin?.......................................41

D.  Issue Three: Did International Discovery or Any of Its Agents Believe
that Purchasing bwin Shares Violated 18 U.S.C. Section 1955?.............................42

E.  Issue Four: Is It in the Best Interests of ACWMF to Pursue
Any of the Claims Set Forth in Mr. Gomes' Complaint or
Any Related Claims Not Pleaded in the Complaint?.................................44

VIII. Conclusion ........................................................................................49

Appendix A: Memoranda of Interviews
    1. Summary of Mr. Chuck Etherington's Interview
    2. Summary of Ms. Jan Lewis' Interview
    3. Summary of Mr. Stephen Yates' Interview
    4. Summary of Mr. John Whitten's Interview
    5. Summary of Mr. James Olson's Interview
    6. Summary of Mr. Brian Brady's Interview
    7. Summary of Mr. Federico Laffan's Interview
    8. Summary of Mr. Geoffrey Burger's Interview
    9. Summary of Mr. Mark Kopinski's Interview

10. Summary of Mr. Anthony Han's Interview
11. Summary of Mr. Thomas Brown's Interview
12. Summary of Mr. Jim Stowers, III's Interview
13. Summary of Mr. William Lyons' Interview
14. Summary of Mr. Jonathan Thomas' Interview
15. Summary of Mr. Enrique Chang's Interview
16. Summary of Ms. Jeannine Strandjord's Interview
17. Summary of Mr. Don Pratt's Interview
18. Summary of Mr. Tim Webster's Interview
19. Summary of Ms. Andrea Hall's Interview
20. Summary of Ms. Christine Rolli's Interview

Appendix B: Chronology

# I. Executive Summary

    Mr. Gomes is an investor in the American Century International Discovery Fund ("International Discovery" or the "Fund"), a mutual fund product offered by American Century World Mutual Funds, Inc. ("ACWMF"). In April 2013, Mr. Gomes made a formal demand on the ACWMF Board of Directors ("ACWMF Board") seeking action against defendants for allegedly causing the Fund to unlawfully use investors' money to purchase shares of two allegedly illegal off-shore internet gambling businesses: NETeller plc ("Neteller") and bwin Interactive Entertainment AG, formerly BETandWIN.com Interactive Entertainment AG ("bwin"). This was the second iteration of claims brought forward by Mr. Gomes. The first complaint was initiated in January 2010 and was dismissed "with prejudice" in February 2012. Mr. Gomes appealed this decision to the United States Court of Appeals for the Eighth Circuit, which affirmed the district court's "with prejudice" dismissal in March 2013.

    The ACWMF Board initially deferred taking any action on the April 2013 demand, as the parties were engaged in a good faith effort to reach a Tolling and Standstill Agreement, which ultimately did not come to fruition. Upon the breakdown in negotiations relative to the Tolling and Standstill Agreement, the ACWMF Board appointed a Special Subcommittee in April 2014 to investigate Mr. Gomes' complaint and to make a recommendation as to whether it would be in the best interest of ACWMF's shareholders to pursue action against the named defendants, or to bring suit against other individuals or entities, for the alleged unlawful purchase of shares in Neteller and bwin. The Special Subcommittee was comprised of two independent directors who serve on the ACWMF Board, Ms. Jan Lewis and Mr. Stephen Yates. Neither Ms. Lewis nor Mr. Yates was a member of the ACWMF Board at the time of the alleged unlawful activity nor is either named as a defendant in the suit launched by Mr. Gomes in March 2014.

    The Special Subcommittee reviewed the principles set forth in the Court of Appeals of Maryland's *Boland v. Boland* decision as a guidepost for its investigation. In June 2014, Shook, Hardy & Bacon, L.L.P. was retained by the Special Subcommittee to serve as independent counsel and to assist with the investigation. The investigation, which spanned nearly six months, was focused on four key questions:

1. At the time the Fund invested in Neteller and bwin, were Neteller and bwin violating any U.S. laws?

2. If so, did the Fund violate 18 U.S.C. Section 1955, or any other federal laws, by purchasing publicly traded shares of Neteller and bwin?

3. If so, did the Fund or any of its agents know that purchasing Neteller and bwin shares violated 18 U.S.C. Section 1955?

4. If so, is it in the best interests of ACWMF to pursue any of the claims set forth in Mr. Gomes's complaint or any related claims not pleaded in the complaint?

    The Special Subcommittee, while aware of the previous legal proceedings between Mr. Gomes and the defendants and of a similar claim being currently litigated (*Seidl v. Am. Century*

*Cos., Inc*.), made its best efforts to bring its own process and independent judgment to the review of this demand.

Recognizing that the acts in question took place more than eight years ago, the Special Subcommittee believed that its investigation should include a robust review of the environment in which the Fund was operating during the time of the investments at issue. This examination included a review of the legislative landscape leading up to and during the relevant time period and the commentary and media coverage of contemporaneous events. This review assisted the Special Subcommittee in understanding the factors impacting the Fund's investment process within the context of that environment. During the investigation, the Special Subcommittee, assisted by its independent counsel, reviewed thousands of documents; conducted 22 interviews of named defendants and other relevant witnesses; met with Mr. Gomes' counsel; reviewed relevant case law, including case law solicited from Mr. Gomes' counsel; reviewed court documents in similar matters; and met frequently with counsel to review progress, discuss findings, receive guidance and to give directions.

The Special Subcommittee, having completed its investigation, makes the following findings and recommendations.

1. As to the question of whether at the time the Fund invested in Neteller and bwin, were Neteller and bwin violating any U.S. laws:

    a. Mr. Gomes claims that it was well established in 2005 and 2006 that internet gaming was illegal under existing U.S. laws. The Special Subcommittee notes that while the U.S. Department of Justice ("DOJ") may have commented on their views regarding the legality of internet gaming in the months leading up to and during the relevant time period, DOJ is not the law making body of the United States, nor is it the body responsible for interpreting the laws. Rather, the Special Subcommittee finds in its review of the legislative history over the years leading up to 2006 that Congress had not expressly legislated in the area of internet gaming, and was, instead, in the midst of repeated efforts to pass new and/or clarifying legislation. Likewise, a review of relevant, contemporaneous case law reflects that federal courts had not addressed the issue of the legality of internet poker and casino gaming. Therefore, the Special Subcommittee finds insufficient evidence to conclude that internet gaming was a violation of U.S. laws during the time period of the investments.

    b. Mr. Gomes claims that Neteller was, at the time of the investments, engaged in activities that violated U.S. gaming laws. The Special Subcommittee notes that, during the relevant time period, Neteller was not a gaming operator, but rather was a foreign corporation whose primary business model was to serve consumers and businesses around the world as an on-line "wallet." While legislation was passed in late 2006 to limit some of these on-line "wallet" transactions, the Special Subcommittee finds insufficient evidence to conclude that Neteller was operating in an illegal manner during the time period of the investments. Additionally, while Neteller executives were charged with aiding and abetting

2

violations of U.S. law in 2007, this occurred after the relevant time frame in this matter.

c. Mr. Gomes claims that bwin was at the time of the investments engaged in activities that violated U.S. gaming laws. The Special Subcommittee notes that bwin is a foreign corporation with a significant market presence in the European Union. bwin's 2005 Annual Report, issued during the relevant time period, showed no reported U.S. presence for it operations. In addition, the Special Subcommittee found during its interview process that bwin communicated to Fund personnel that filters within their on-line system were in place to screen or block activity from U.S. residents and disclosed in public filings that it did not offer sports betting to U.S. customers. While bwin did acquire in 2006 an online poker company, Ongame, that did have U.S. customers, public filings reflect that bwin continued its policy that prohibited the placement of sports bets by U.S. customers. Accordingly, the Special Subcommittee finds insufficient evidence to support the claim that bwin was operating in an illegal manner during the time period of the investments.

2. As to the question of whether the Fund violated 18 U.S.C. Section 1955, or any other federal laws, by purchasing publicly traded shares of Neteller and bwin:

a. Mr. Gomes claims that by purchasing shares on an open exchange of a publicly traded company (both Neteller and bwin were traded on the London Stock Exchange), that the Fund engaged in the operation of an illegal gambling entity and violated RICO laws. Based on its review of the relevant case law, the Special Subcommittee notes that it was unable to find any case where a court has held a passive investor liable for the illegal acts of the entity in which it owned shares. Therefore, the Special Subcommittee finds that there exists no legal support for a claim that the Fund's actions in purchasing shares of a publicly traded company on an open exchange was a violation of any U.S. law.

3. As to the question of whether the Fund or any of its agents knew that purchasing Neteller and bwin shares violated 18 U.S.C. Section 1955:

a. Mr. Gomes claims that the Fund and/or its agents knew, or should have known, that investments in Neteller and bwin were violations of U.S. laws. Based on its extensive review of the documents, its interviews with investment personnel and other relevant witnesses, its understanding of the Fund's investment objectives, its knowledge that other respected U.S. fund managers were carrying similar investments, and the fact that bwin was actually part of the S&P/Citi EMI Growth World, ex-US Index against which the Fund was benchmarked, the Special Subcommittee finds that the Fund and/or its agents did not know, or have any reason to believe, that the investments in Neteller and bwin were a violation of existing U.S. laws.

3

4. As to the question of whether it is it in the best interests of ACWMF to pursue any of the claims set forth in Mr. Gomes's complaint or any related claims not pleaded in the complaint:

   a. In light of its findings on the previous three issues, the Special Subcommittee does not believe that it is in the best interests of ACWMF to pursue the demand. The Special Subcommittee further notes that, even if it had reached a different conclusion on any of the three proceeding issues, it would still not find it in the best interest of shareholders to pursue the demand based on the cost (which would be borne by shareholders), the distraction of prolonged litigation taking away from the Fund's primary objective to add value for shareholders, and the low likelihood of success. The Special Subcommittee took a number of factors into consideration, including the following, in reaching this conclusion:

      i. Shareholders were apprised in the Fund's Prospectus and Statement of Additional Information of the increased volatility and risks inherent in investing in international markets, including the risk that they could lose money by investing in the Fund. The Fund also disclosed that it would utilize the S&P/Citi EMI Growth World, ex-US index (which included several on-line gaming companies as of Dec. 31, 2005) as the benchmark for its performance.

      ii. In its management agreement with the Advisor, the Fund agrees that "in the absence of willful misfeasance, bad faith, gross negligence, or reckless disregard of its obligations or duties" the Advisor will not be subject to liability to the Fund or any shareholder of the Fund. The Special Subcommittee did not find any evidence of behavior that would remove the Fund's duty to indemnify the Advisor. Therefore, any recovery made would actually be the Fund paying itself, while likely expending substantial attorneys' fees during the process.

      iii. It would be difficult to prove damages and proximate cause given the construct of a mutual fund, where shareholders purchase units or shares of the fund, not of the underlying securities, and participate proportionally in the gain or loss of the fund in its totality. The Special Subcommittee notes that, over the course of the relevant time period, the Fund transacted hundreds of trades in numerous securities, each of which resulted in a gain or loss for the Fund. Given that the Fund outperformed its benchmark and posted a gain of 23.4% to its share price (from the time it purchased its initial shares of Neteller to the time it sold its last shares of bwin), it would be difficult to prove that shareholders were "damaged" and to attribute damages proximately to acts of Fund personnel investing in Neteller and bwin, which never constituted more than 1% of the Fund's total holdings.

Therefore, the Special Subcommittee recommends that the ACWMF Board reject Mr. Gomes' demand and seek immediate dismissal of the current litigation based on the claims' lack of merit.

4

# II. HISTORY AND BACKGROUND OF THE DEMAND

## A.     Procedural History

Mr. Gomes' present complaint is the second iteration of claims that have been litigated for nearly five years. The litigation first began when Mr. Gomes filed an initial derivative and class action complaint in January 2010.[1] Defendants, arguing that his claims were each derivative and that he did not adequately plead demand futility, moved to dismiss that complaint in August 2011. The Court agreed with the defendants and dismissed the case "with prejudice" in February 2012.[2] Shortly thereafter, Mr. Gomes appealed this decision to the United States Court of Appeals for the Eighth Circuit. The Court of Appeals affirmed the district court's "with prejudice" judgment in March 2013.[3]

After the Eighth Circuit's decision, Mr. Gomes made a formal demand on the ACWMF Board in April 2013. For several months, the ACWMF Board deferred action because there was a possibility of entering into a Tolling and Standstill Agreement with Mr. Gomes. However, after negotiations broke down, Mr. Gomes filed his present complaint in late-March 2014.[4] Like his initial complaint, Mr. Gomes posits his causes of actions (including civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty, negligence, waste, and breach of contract) on allegedly illegal investments made by the International Discovery Fund in two companies involved in online gaming: Neteller and bwin.

## B.     Prior Judicial Review of Mr. Gomes' Claims

The Special Subcommittee notes, as a preliminary matter, that a federal district court has questioned the merits of the causes of actions asserted by Mr. Gomes. While the defendants moved to dismiss the initial complaint on the grounds of inadequately pleaded demand futility, the district court appears to have, *sua sponte*, extended the dismissal order to the merits of Mr. Gomes' RICO claims. The Court stated:

> The legal issues in this case have been litigated and decided by several courts around the country. To date, no court has found merit to any of the claims presented by plaintiff's counsel, and the Court can find no reason why the claims here should fare any better.[5]

---

[1] Verified Derivative and Class Action Complaint, *Gomes v. Am. Century Cos., Inc*., No. 4:10-cv-00083-SOW [Doc. 1] (W.D. Mo. January 27, 2010). While there is some variation between that complaint and the present one, there are few material differences.

[2] *Gomes v. Am. Century Cos., Inc*., No. 10-0083-CV-W-SOW, 2012 WL 10831065 (W.D. Mo. Feb. 16, 2012).

[3] *Gomes v. Am. Century Cos., Inc*., 710 F.3d 811 (8th Cir. 2013) .

[4] Verified Derivative Complaint, *Gomes v. Am. Century Cos., Inc*., No. 4:14-cv-00283-JTM [Doc. 1] (W.D. Mo. March 26, 2014). All subsequent citations to Mr. Gomes' present complaint will take the following form: Complaint, ¶ _____.

[5] *Gomes*, 2012 WL 10831065, at *2.

5

The Court went on to base its dismissal order on the reasons stated in *McBrearty v. Vanguard Group, Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. April 2, 2009), and *Seidl v. Am. Century Co.*, 713 F.Supp.2d 249 (S.D.N.Y. 2010). In *McBrearty* and *Seidl,* the Courts dismissed, with prejudice, plaintiffs' RICO claims "[b]ecause intervening events, and not the defendants' investment decisions, proximately caused the plaintiffs' investment losses."[6] Although the Eight Circuit's subsequent review of the district court's order did not reach the issue of proximate causation under RICO,[7] the Court affirmed the district court's judgment—which was a "with prejudice" dismissal of claims—including its dismissal of Mr. Gomes' RICO claims.[8]

The preclusive effect of the district court's order on Mr. Gomes' present claims is a legal question beyond the scope of this report. However, the possible preclusion of Mr. Gomes' claims combined with, at least, three federal court opinions undermining similar theories call into question the ultimate legal viability of a substantial portion of Mr. Gomes' complaint. Nevertheless, the Special Subcommittee investigated the alleged facts and independently assessed the causes of action asserted in Mr. Gomes' complaint in order to draw the conclusions set forth herein.

## C.      American Century Entities and Parties Identified in the Complaint

American Century World Mutual Funds, Inc. ("ACWMF") is a Maryland corporation with its principal place of business in Kansas City, Missouri. ACWMF is registered under the Investment Company Act of 1940 as an open-ended management investment company. ACWMF is a series mutual fund that offers multiple portfolios of securities. The International Discovery Fund is one of the funds offered by ACWMF. ACWMF has a single board of directors ("ACWMF Board") that oversees the various funds it offers.

American Century Companies, Inc. ("ACC") is a Delaware corporation with its principal place of business in Kansas City, Missouri. ACC provides investment management services to ACWMF through its subsidiary American Century Investment Management, Inc.

American Century Investment Management, Inc. ("ACIM") is a Delaware corporation with its principal place of business in Kansas City, Missouri. ACIM serves as investment advisor to ACWMF. Under its management agreement with ACWMF, ACIM is responsible for management of the International Discovery Fund, including the development and implementation of its investment strategy. In brief, ACIM runs the business of the International Discovery Fund and other funds issued by ACWMF.

International Discovery is a fund offered by ACWMF. Initiated in April 1994, it seeks capital growth by investing primarily in equity securities of small- to medium-sized companies that are located in foreign, developed countries or emerging market countries. The Fund seeks

---

[6]  *McBrearty v. Vanguard Group, Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220, at *4 (S.D.N.Y. April 2, 2009); *see Seidl v. Am. Century Cos., Inc.*, 713 F.Supp.2d 249, 255 (S.D.N.Y. 2010).

[7]  *Gomes v. Am. Century Cos., Inc.*, 710 F.3d 811, 818 (8th Cir. 2013).

[8]  *Id.*

securities that it believes will grow over time. Investment decisions are based primarily on analysis of individual companies, not on broad economic forecasts. The Fund typically buys securities of companies whose earnings or revenues are growing at an accelerating pace.

Defendant James E. Stowers, Jr. ("Mr. Stowers, Jr.") is the founder of American Century. He is also the former Vice Chairman of ACWMF, a former director, controlling shareholder, and Chairman of ACC, and a former director of ACIM. Mr. Stowers, Jr. served as a director on the ACWMF board in 2005 and 2006. He also served on the board of ACC and ACIM in 2005 and 2006, but he had no executive role at these companies during that time. Mr. Stowers, Jr. passed away in March 2014, yet he remains a named defendant in Mr. Gomes' complaint.

Defendant James E. Stowers III (Mr. Stowers III") served as a director of ACWMF, ACC, and ACIM in 2005 and 2006. Mr. Stowers III did not hold an executive position at ACIM during that time frame. Mr. Stowers III left American Century in September 2007.

Defendant Jonathan S. Thomas ("Mr. Thomas") is the President and CEO of ACC and ACIM. He has served in these positions since March 2007. From the time he joined American Century in November 2005 till February 2007, Mr. Thomas served as CFO and executive vice president of ACIM. He is currently a member of the ACWMF Board, but he did not serve on that board in 2005 and 2006.

Defendants Thomas A. Brown ("Mr. Brown"), Andrea C. Hall ("Ms. Hall"), Donald H. Pratt ("Mr. Pratt"), Gale E. Sayers ("Mr. Sayers"), M. Jeannine Strandjord ("Ms. Strandjord"), and Timothy S. Webster ("Mr. Webster") were independent directors, as defined by the Investment Company Act of 1940 on the ACWMF Board in 2005 and 2006. Of these defendants, only Mr. Brown, Ms. Hall, and Ms. Strandjord continue to serve on the ACWMF Board.

Defendant William M. Lyons ("Mr. Lyons") was President and CEO of ACC and ACIM from October 2000 till May 2007. He was also President of ACWMF during that period.

Defendant Enrique Chang ("Mr. Chang") joined American Century in March 2006 as Discipline Chief Investment Officer of international equities at ACIM. In early 2007, Mr. Chang became ACIM's Chief Investment Officer ("CIO"). Mr. Chang left ACIM in 2013.

Defendants Mark Kopinski ("Mr. Kopinski") and Brian Brady ("Mr. Brady") were employed by ACIM as the co-portfolio managers of International Discovery during 2005 and 2006.

# III. SPECIAL SUBCOMMITTEE

## A. Formation of the Special Subcommittee

Mr. Gomes sent a "Demand for Action" to the ACWMF Board in April 2013. The ACWMF Board did not immediately act on the demand because there was a possibility of negotiating a Tolling and Standstill Agreement between Mr. Gomes and the ACWMF Board.

After many months, the negotiations for an agreement broke down and Mr. Gomes filed his complaint in March 2014. The ACWMF Board's independent directors met on April 21, 2014, to discuss possible courses of action. After discussion, the independent directors resolved to appoint a Special Subcommittee of the ACWMF Board to thoroughly investigate the allegations in Mr. Gomes' complaint and to advise the full ACWMF Board of a recommended course of action. To that end, the independent directors unanimously appointed Ms. Jan Lewis ("Ms. Lewis") and Mr. Stephen Yates ("Mr. Yates") as the members of the Special Subcommittee, with Ms. Lewis serving as chair. The independent directors authorized the Special Subcommittee to select its own counsel to assist in its investigation.

## B.      Members of the Special Subcommittee

The Special Subcommittee's chair, Ms. Lewis, graduated from the University of Nebraska in 1979 with a bachelor's degree in civil engineering. She received an M.B.A. degree from Rockhurst University in 1992. After leaving university, Ms. Lewis worked for Black & Veatch and Andrew Corporation. Ms. Lewis then worked for Butler Manufacturing Company ("Butler Manufacturing") for about 20 years and ultimately became president of one of its divisions. After leaving Butler Manufacturing, Ms. Lewis became the CEO of Catholic Charities of Northeast Kansas, a position she held from approximately July 2006 to December 2013. Ms. Lewis currently serves as a member of the board of trustees of Conception Seminary College in Conception, Missouri.

Ms. Lewis began her service on the ACWMF Board in February 2011 as a full-voting, independent director.

The Special Subcommittee's other member, Mr. Yates, graduated from the University of Alabama in 1970 with a bachelor's degree in industrial engineering. He received a master's degree in industrial engineering from the University of Alabama in 1978. The majority of Mr. Yates' career involved jobs in IT management, although in a few instances he worked in engineering operations. During his career, Mr. Yates worked at Lonestar Gas, Coca-Cola, the Dallas Federal Reserve Bank, Pool, EBASCO, Brown & Root, Rockwell International, USAA, and Key Bank. Mr. Yates also served on Key Bank's board of directors from approximately 2004 to 2010 and on the board of directors for Applied Industrial Technologies Company from approximately 2000 to 2010.

Mr. Yates began his service on the ACWMF Board in February 2011 as an advisory, non-voting independent director. He became a full-voting, independent director a year later in March 2012.

## C.      Special Subcommittee's Independence

Under the principles set forth in the Court of Appeals of Maryland's *Boland v. Boland* decision, the Special Subcommittee and its counsel thoroughly probed Ms. Lewis' and Mr. Yates' independence with respect to each defendant. The Special Subcommittee searched for "any significant business relationship or affiliations between the [Special Subcommittee]

8

members and the defendant directors."[9]  It further investigated whether any "personal or social relationships"[10] existed between the Special Subcommittee members and the defendants.   In brief, the Special Subcommittee sought to identify, for each member, any reason why he or she would not be in "a position to base his [or her] decision on the merits of the issue rather than being governed by extraneous considerations or influences."[11]

Specifically, the Special Subcommittee's independence inquiry scrutinized various areas, including: 1) its members' involvement, if any, in the actions giving rise to Mr. Gomes' demand or complaint; 2) business or professional connections, if any, between its members and the defendants; 3) social, charitable, or other personal connections, if any, between its members and the defendants; 4) business, professional, social, charitable, or other personal connections, if any, between its members and the defendants' immediate family members; 5) the process by which its members were selected to the ACWMF Board; and 6) whether its members had come to the investigation with any pre-conceived notions regarding the validity of Mr. Gomes' allegations or had pre-determined the investigation's outcome.

The Special Subcommittee also included as a component of each of its interviews— whether with defendants or other fact witnesses—a comprehensive inquiry into any professional or personal connections that each individual may have had with Ms. Lewis and Mr. Yates that might impact the Special Subcommittee's ability to make an unbiased recommendation.

The Special Subcommittee found no significant professional or personal connections or relationships among Ms. Lewis, Mr. Yates, and any of the defendants, current ACWMF Board members who are not named defendants, or other individuals at International Discovery involved in the Neteller and bwin investments.  As one would expect, there were limited connections between Ms. Lewis, Mr. Yates, and certain of these individuals but nothing that extended beyond the typical relationships that would be expected among board members.  And as relevant case law makes clear, such minor connections do not compromise the independence or objectivity of the individuals making a certain decision (or in this case, a recommendation).[12]

### Ms. Lewis' Independence

The Special Subcommittee and its counsel concluded that Ms. Lewis was independent to impartially evaluate Mr. Gomes' allegations and to render an unbiased recommendation regarding a proposed course of action.  Ms. Lewis joined the ACWMF Board in 2011—well after the events on which Mr. Gomes' claims are predicated.  She has no disqualifying professional connections with any of the defendants, nor does she have any disqualifying social, charitable, or other personal connections.  In addition, there are no connections between defendants and her immediate family.  Ms. Lewis did not prejudge Mr. Gomes' allegations and

---

[9] *Boland v. Boland*, 423 Md. 296, 354 (2011).
[10] *Id.* at 355.
[11] *See Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del. 1985).
[12] *See Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004) (even when directors move in the same social circles, attend the same weddings, develop business relationships before joining the board, and describe each other as "friends," directors are still presumed capable of impartial judgment).

claims and, before the substantive investigation began, Ms. Lewis indicated her willingness to pursue the *Gomes* litigation if the Special Subcommittee found that option to be in ACWMF's best interest.

The investigation into Ms. Lewis' independence uncovered only inconsequential connections with two defendants—connections which do not even approach the "significant relationship" standard set out in *Boland*.

During part of Ms. Lewis' tenure at Butler Manufacturing, Mr. Don Pratt was the company's CEO. Although Mr. Pratt knew Ms. Lewis' name, she never had a reporting relationship with Mr. Pratt. And Ms. Lewis only recalled "interacting" with Mr. Pratt on two occasions. The first occurred in conjunction with a presentation she made with fellow M.B.A. students about Butler Manufacturing's international strategy. At the group's invitation, Mr. Pratt attended the presentation, but did not interact one-on-one with Ms. Lewis. The second "interaction" occurred when Ms. Lewis and her management group made a presentation at a dinner meeting of Butler Manufacturing's board of directors. Mr. Pratt was at the meeting, but again, there was no personal interaction between Mr. Pratt and Ms. Lewis. During her years at Butler Manufacturing, Ms. Lewis never had a "sit-down" conversation with Mr. Pratt. Nor did she ever have coffee or dine with Mr. Pratt. And when Mr. Pratt left Butler Manufacturing, Ms. Lewis did not exchange phone numbers or email addresses with him. The limited interactions between Ms. Lewis and Mr. Pratt cannot be characterized as a relationship, let alone a "significant relationship."

Mr. Pratt submitted Ms. Lewis' name for consideration as an ACWMF Board member. However, this recommendation did not spring from a personal or professional relationship, but from Mr. Pratt's awareness of Ms. Lewis' managerial capacities and accomplishments. Mr. Pratt's nomination was followed by interviews with other ACWMF Board members and a full ACWMF Board vote to appoint Ms. Lewis. Thus, Mr. Pratt's nomination of Ms. Lewis does not alter the Special Subcommittee's, or its counsel's, assessment of Ms. Lewis' independence. Mr. Pratt's minimal involvement in bringing Ms. Lewis to the ACWMF Board has not affected her capacity to impartially evaluate the claims against Mr. Pratt or the other defendants. The Special Subcommittee's conclusion in this regard is reinforced by various court decisions.[13]

Ms. Lewis had one other negligible connection with Ms. Strandjord. Ms. Strandjord served on the board of directors for Catholic Charities of Northeast Kansas when Ms. Lewis was made its CEO, but the board met only a handful of times per year, and Ms. Strandjord was often absent due to scheduling conflicts. Ms. Strandjord never held a management position, thus she never came in close, working contact with Ms. Lewis. Nor was Ms. Strandjord a member of the selection committee that brought Ms. Lewis to the organization. Again, Ms. Lewis' connection with Ms. Strandjord does not alter the Special Subcommittee's, or its counsel's, appraisal of her independence. The *Boland* Court made clear that "a mere acquaintance of a party would not be

---

[13] It is well-established that "[t]he majority view recognizes that independent directors are capable of rendering an unbiased decision even though they were appointed by the defendant directors and share a common experience with defendants." *Seidl v. Am. Century Cos, Inc.*, No. 10-4152-CV-W-ODS, 2014 WL 5463661, at *11 (W.D. Mo. July 2, 2014) (*citing Lerner v. Prince*, 2014 WL 2118253 (N.Y. App. Div. May 22, 2014)).

10

disqualified from serving on a [special subcommittee], and prior service on another board or commission would not show *per se* bias."[14]

### *Mr. Yates' Independence*

After a thorough investigation into Mr. Yates' background, the Special Subcommittee and its counsel concluded that Mr. Yates is independent to impartially evaluate Mr. Gomes' claims and allegations and to render an unbiased recommendation regarding a proposed course of action. Mr. Yates joined the ACWMF Board in 2011—well after the events on which Mr. Gomes' claims are predicated. He has no professional connections with any of the defendants, nor does he have any disqualifying social, charitable, or other personal connections. In addition, there are no connections between his immediate family and the defendants. Mr. Yates did not prejudge Mr. Gomes' allegations and claims and, before the substantive investigation began, Mr. Yates indicated his willingness to pursue the *Gomes* litigation if the Special Subcommittee found that option to be in ACWMF's best interest.

The investigation into Mr. Yates' independence uncovered only one inconsequential connection with one defendant—an immaterial connection that does not even approach, let alone meet, the "significant relationship" standard set out in *Boland*.

Mr. Yates maintains a residence in Panama City, Florida. Ms. Andrea Hall's primary residence is located approximately 45 minutes away in Lynn Haven, Florida. Over the past three years that Mr. Yates has sat on the ACWMF Board, he and his wife have had lunch with Ms. Hall and her husband on approximately two or three occasions. Beyond these two or three meals, Mr. Yates and Ms. Hall share no professional, personal, social, charitable, or other connection. As a result, these isolated events do not alter the Special Subcommittee's, or its counsel's, assessment of Mr. Yates' independence. Infrequent dining with Ms. Hall has not affected Mr. Yates' capacity to impartially evaluate the claims against her or the other defendants. As with the analysis described for Ms. Lewis above, court decisions validate the Special Subcommittee's conclusion.[15]

### *Conclusion*

The Special Subcommittee concluded that Ms. Lewis and Mr. Yates were independent from the named defendants, other ACWMF Board members, and other individuals involved in the investments highlighted in Mr. Gomes' complaint and could, accordingly, render an impartial and unbiased assessment and recommendation regarding the validity of the allegations made by Mr. Gomes and whether it is in the best interest of ACWMF to pursue any of the asserted causes of action.

In addition, the Special Subcommittee notes that while inquiring into the relationships between the named defendants, current outside/independent[16] board members not named as

---

[14] *Boland*, 423 Md. at 356 n.44.

[15] *See supra* note 13.

[16] Mr. Whitten and Mr. Olson are "independent" directors as defined by the Investment Company Act of 1940, as amended, because, for example, they are not affiliated with ACIM. However,

defendants (Mr. Whitten and Mr. Olson), other non-defendant fact witnesses and Ms. Lewis and Mr. Yates, it similarly found no significant business, personal, or social relationships among any of these individuals beyond those insignificant contacts expected from board members and business colleagues.

**D.      Compensation**

For their extra service on the Special Subcommittee, Ms. Lewis and Mr. Yates received the same standard rate paid to ACWMF Board members for service rendered in the regular course of ACWMF Board service.  This compensation was not contingent on certain findings or a favorable recommendation to the ACWMF Board.  In other words, the members of the Special Subcommittee were compensated for their investigative work and not the conclusion reached through their investigation.

**E.      Selection of Counsel**

*Selection Process*

The Special Subcommittee developed a Request for Proposal for legal services which it sent out to four different law firms across the country.  The Special Subcommittee interviewed three of those firms on May 29, 2014 in Kansas City, Missouri.  Both Ms. Lewis and Mr. Yates participated in these interviews.  As a pre-qualification for consideration, each firm was required to conduct an independence analysis to determine that it was free of conflicts and that, at the time, they were not representing ACC, ACIM, ACWMF, the International Discovery Fund, or the individual defendants in any matters.

Each firm was provided with a copy of Mr. Gomes' complaint prior to the interviews and was asked to discuss its views on what were the central issues; proposed framework for assisting the Special Subcommittee in conducting the investigation; anticipated timeline and costs for completing the work and assisting with the preparation of the final report; and experience with investigations of a similar nature.

At the conclusion of the interviews, the Special Subcommittee met and reviewed each firm's responsiveness to the Request for Proposal, the qualifications of the personnel each firm would bring to the investigation, and the Special Subcommittee's level of confidence in the answers it received to its questions.  The Special Subcommittee ultimately engaged the law firm of Shook, Hardy & Bacon L.L.P. ("SHB") to serve as its independent counsel.  The Special Subcommittee found SHB's response to its Request for Proposal to be especially responsive to the needs and character of the investigation.  The Special Subcommittee was particularly drawn to Mr. David Maria's experience in DOJ investigations and Mr. Joe Rebein's experience in securities litigation and overall commercial litigation background in which he has represented both plaintiffs and defendants.  In sum, the Special Subcommittee determined that SHB, and the

_____

the Special Subcommittee also explored their "independence" to take impartial action on the Special Subcommittee's recommendation to the ACWMF Board.  In this regard, the Special Subcommittee also notes that Mr. Brown, Ms. Strandjord, and Ms. Hall, though defendants are "independent" directors under the Investment Company Act of 1940, as amended.

attorneys it proposed to assist the Special Subcommittee, presented the best mix of competence and experience to advise and assist in the investigation.

### *Counsel from Shook, Hardy & Bacon L.L.P.*

Joe Rebein is a partner in SHB's Kansas City office. Mr. Rebein has served as lead trial counsel in complex litigation matters, including antitrust, contract, and securities class actions, representing the interests of both plaintiffs and defendants. He has been involved in trials in federal and state courts, NASD arbitrations, general civil arbitrations, administrative proceedings before state and federal regulatory bodies, and CFTC enforcement actions. He has acted as defense counsel in securities class actions and derivative litigation and has represented both claimants and broker/dealers in securities arbitrations and litigation.[17]

David Maria is a partner in SHB's Washington, D.C. office. His practice focuses on white collar criminal litigation and government enforcement and compliance. He has substantial experience conducting corporate internal investigations, both domestically and internationally, and litigating complex white collar criminal matters, including matters relating to health care fraud, the Foreign Corrupt Practices Act (FCPA), and securities fraud. Before joining SHB, Mr. Maria was a federal prosecutor in the Criminal Division of the U.S. Department of Justice (DOJ), working in both the Health Care Fraud Unit and the FCPA Unit of the Fraud Section.[18]

Mike Cargnel is a partner in SHB's Kansas City office. Mr. Cargnel focuses his practice on representing business owners, companies, and entrepreneurs in complex commercial litigation involving a wide range of business disputes, including breach of contract, construction, fiduciary duty claims, professional malpractice, insurance coverage, and employment issues. Mr. Cargnel has tried and won cases in state and federal courts and in arbitration matters before the Financial Industry Regulatory Authority and American Arbitration Association. He also assists in representing healthcare providers in business disputes as well as individual providers in credentialing or licensing issues.[19]

### *Counsel's Independence*

Mr. Rebein, Mr. Maria, Mr. Cargnel, and SHB were first contacted about this engagement in mid-May 2014. At that time they were not representing ACC, ACIM, ACWMF, the International Discovery Fund, or the individual defendants. Since that time, they have only been engaged by the Special Subcommittee and do not represent any of the defendants. Thus, the Special Subcommittee's counsel was also an independent participant in the investigation.

---

[17] Mr. Rebein's full bio is available at: http://www.shb.com/attorney_detail.aspx?id=18.
[18] Mr. Maria's full bio is available at: http://www.shb.com/attorney_detail.aspx?id=1190.
[19] Mr. Cargnel's full bio is available at: http://www.shb.com/attorney_detail.aspx?id=189.

# IV.  INVESTIGATION PROCESS

## A.    Overview

For the past six months, the Special Subcommittee has conducted a comprehensive investigation into the issues raised by Mr. Gomes' allegations and claims.  Assisted by counsel, the Special Subcommittee reviewed thousands of documents; conducted interviews of the defendants and other relevant witnesses; met with Mr. Gomes' counsel, reviewed relevant case law, including case law solicited from Mr. Gomes' counsel; reviewed other relevant case law and court documents, including pleadings filed in the *Seidl* litigation; and met frequently with counsel to receive guidance and to give directions.  These extensive efforts are discussed in detail below.

As a threshold matter, the Special Subcommittee was faced with establishing the relevant time frame on which to focus its efforts.  It ultimately decided to focus its investigation on the time period beginning on January 1, 2004 and ending on March 31, 2007.  It selected this time period because the first relevant investment, in Neteller, was purchased in January 2005 and sold in October 2005.  The second relevant investment, in bwin, was purchased in January 2006 and sold in September 2006.  Thus, the January 1, 2004 to March 31, 2007 time frame captures not only the entire period in which International Discovery held the relevant securities, but also includes a year before the first investment was purchased and two full quarters after the second investment was sold.  The Special Subcommittee formulated this approach in a conservative attempt to capture all relevant information bearing on the allegations, claims, and issues raised by Mr. Gomes.

## B.    Meeting with Mr. Gomes' Counsel

On July 1, 2014, the Special Subcommittee's counsel met in New York with Mr. Gomes' counsel, Mr. Thomas Sheridan.  At that meeting, Mr. Sheridan was given an opportunity to assist the Special Subcommittee in establishing the framework for the investigation.  Mr. Sheridan agreed that the investigation's temporal focus—*i.e.*, January 1, 2004 to March 31, 2007—was sufficiently comprehensive.  Mr. Sheridan was provided with the Special Subcommittee's proposed custodian list (for collection of relevant documents) and the proposed search terms.  He was also given an opportunity to offer suggestions.  In this regard, Mr. Sheridan agreed with the custodian list and offered additional search terms for the document collection (identified in next section).

The Special Subcommittee, through counsel, also requested that Mr. Sheridan provide additional information related to the legal theories driving Mr. Gomes' demand and complaint. In response, Mr. Sheridan referred the Special Subcommittee to the summary judgment briefing filed in the *Seidl* litigation.  He also presented the Special Subcommittee with "representative cases" that, in his opinion, provided support for the causes of action asserted in Mr. Gomes' complaint, specifically citing the following cases:

- *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006);
- *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001);

14

- *Nixon v. Interactive Gaming & Commc'ns Corp.*, CV-97-7808, 1997 WL 33545763 (Mo. Cir. Ct. May 23, 1997); and
- *Vacco v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844 (N.Y. Co. Sup. Ct. 2000).

The Special Subcommittee duly obtained copies of the summary judgment briefing in *Seidl* (which was redacted due to the seal order) and the cases listed above.  As indicated below, a review of these court documents and court opinions constituted a portion of the Special Subcommittee's investigation.

## C.  Documents Reviewed

During the course of the investigation, the Special Subcommittee and its counsel reviewed tens of thousands of documents.  These documents can largely be grouped into two broad categories: documents whose custodians were various ACIM employees (custodial documents) and documents in the corporate files of ACWMF and ACIM.  But the Special Subcommittee also located and reviewed relevant documents outside of ACWMF and ACIM's custody and control.

### Custodial Documents

These documents consisted largely of the emails (including attachments) sent and received by relevant individuals, such as certain defendants and International Discovery personnel, during the relevant time frame of January 1, 2004 to March 31, 2007.  Fortunately, these documents had been preserved through a "server snapshot" in October 2008.  As a result, the Special Subcommittee was able to access all of the email traffic that existed in a given user's American Century email account as of October 2008.[20]  In order to determine the relevant custodians beyond the named defendants, the Special Subcommittee reviewed human resources records from the relevant time frame to identify which individuals worked on International Discovery.  Below is the complete list of custodians whose emails were searched by the Special Subcommittee for relevant documents:

1. Mr. Stowers, Jr.
2. Mr. Stowers III
3. Mr. Thomas
4. Mr. Lyons
5. Mr. Chang
6. Mr. Kopinski
7. Mr. Brady
8. Geoff Burger (an analyst during the relevant time frame)
9. Helen Ng (an analyst during the relevant time frame)
10. Stephen Chan (an analyst during the relevant time frame)
11. Federico Laffan (an analyst during the relevant time frame)
12. Yeow Tong Ng (an analyst during the relevant time frame)

---

[20] The following defendants did not have an American Century email account during the relevant time period: Mr. Brown, Ms. Hall, Mr. Pratt, Mr. Sayers, Ms. Strandjord and Mr. Webster.

15

13. Anthony Han (an analyst during the relevant time frame)
14. Charlie Kime (an analyst during the relevant time frame)
15. Alice Boinski (manager in the compliance department during the relevant time frame)

To search these documents effectively, the Special Subcommittee formulated a list of search terms. Mr. Sheridan suggested additional search terms on July 1, 2014, which were included on the list. The following is a complete list of terms used by the Special Subcommittee in searching the email accounts of the custodians named immediately above.

1. Neteller
2. Bwin
3. Betandwin
4. Betandwin.com
5. "Interactive Entertainment"
6. Ongame
7. Internet /2 gambling[21]
8. Online /2 gambling
9. Internet /2 gaming
10. Online /2 gaming
11. UIGE
12. 5363
13. Betonsports
14. PartyGaming
15. Poker
16. Wager! (the "!" was added at Mr. Sheridan's suggestion)
17. Internet /2 betting
18. Online /2 betting
19. "David Carruthers"
20. Teufelberger
21. Bodner
22. "Stephen Lawrence"
23. Lefebvre
24. Dikshit
25. 888.com
26. "Wire Act" (added at Mr. Sheridan's suggestion)
27. "sports book" (added at Mr. Sheridan's suggestion)
28. Punt (added at Mr. Sheridan's suggestion)
29. Goodlatte (added at Mr. Sheridan's suggestion)
30. James /2 leach (revised form of Mr. Sheridan's suggestion of "Leach")
31. Congressman /2 leach (revised form of Mr. Sheridan's suggestion of "Leach")
32. Representative /2 leach (revised form of Mr. Sheridan's suggestion of "Leach")
33. Spitzer (added at Mr. Sheridan's suggestion)
34. Unlawful (added at Mr. Sheridan's suggestion)

---

[21] In this context, "/2" means "within two words of." Thus, the term "Internet /2 gambling" searched for documents that contained the word "internet" within two words of "gambling."

16

35. Illegal! (added at Mr. Sheridan's suggestion)

After finalizing its search terms, the Special Subcommittee delivered the list to ACIM. ACIM ran the search on July 7, 2014 and delivered the hit list to the Special Subcommittee's counsel on July 10, 2014. This initial search returned over 74,000 documents. The Special Subcommittee noticed that two terms suggested by Mr. Sheridan—"unlawful" and "illegal!"—returned thousands of false positives because these terms commonly appear in the stock language of email legal disclaimers. Thus, these terms were removed and the search was repeated. This revised search returned approximately 38,000 documents.

The Special Subcommittee used one of SHB's in-house review teams to conduct an initial relevance review of these 38,000 documents. Before the reviewers began, counsel met with the review team on July 21, 2014 to give detailed directions. At that meeting, the reviewers were provided with an overview of Mr. Gomes' allegations, Mr. Gomes' complaint, the custodian list, and the search terms. As the review progressed, the Special Subcommittee's counsel was in constant communication with the review team's manager. Counsel responded to questions and assisted the review team in refining its process.

After completing the initial document review, the review team identified approximately 1,940 documents as relevant. The Special Subcommittee's counsel then conducted a second relevance review to exclude documents whose subject matter, in reality, fell outside the scope of the investigation. This second review resulted in approximately 960 documents being identified as relevant. These documents were reviewed individually by members of the Special Subcommittee.

### Documents in Corporate Files of ACWMF and ACIM

The Special Subcommittee, with the assistance of counsel, also reviewed thousands of pages of documents from the corporate files of ACWMF and ACIM. The Special Subcommittee initially requested a core set of documents to begin its investigation. ACWMF and ACIM delivered document sets to the Special Subcommittee on June 13, 2014 and July 1, 2014. Inspection of these initial documents prompted the Special Subcommittee to request additional documents from time to time during the course of the investigation. The following are categories of corporate documents and records reviewed and analyzed during the investigation:

- Annual and Semiannual Reports;
- Minutes of Joint Board of Directors Meetings;
- Minutes of Independent Directors Meetings;
- Minutes of Fund Performance Review Committee;
- Prospectuses and Statements of Additional Informational for International Discovery;
- Form N-Q Filings;
- Compliance and Shareholder Communications Committee Documents;
- International Discovery Commentaries;
- International Discovery Fact Sheets;
- Investment Oversight Committee Documents;

17

- Management Agreements and Investment Subadvisory Agreements;
- Trading Records for Neteller and bwin;
- Memorandum Submitted by International Discovery to the ACWMF Board;
- Presentations by International Discovery to the ACWMF Board;
- Minutes of the Valuations Committee;
- Investing Account Reports to the ACWMF Board's Audit Committee;
- Records Reflecting the Value of Neteller and bwin as a Percentage of International Discovery;
- ACWMF's Articles of Incorporation.

***Non-American Century Documents and Information***

The Special Subcommittee also located and inspected relevant documents not held by ACWMF, ACIM, or other American Century custodians. For example, the Special Subcommittee obtained bwin's 2005 and 2006 annual reports, as well as an ad-hoc press release discussing bwin's performance in the first half of 2006. The Special Subcommittee also explored American Century's website and other reputable, financially-focused websites for relevant and useful information.

**D.      Interviews**

The Special Subcommittee, with the assistance of counsel, conducted 22 interviews during the course of its investigation. Meeting with defendants and non-defendants, the Special Subcommittee desired information not only to evaluate the allegations made by Mr. Gomes, but to place his allegations and claims in the proper context. To this end, the Special Subcommittee interviewed a variety of individuals, including all defendants, with the exception of Mr. Sayers and Mr. Stowers, Jr.; other International Discovery personnel involved in the Fund's operations during the relevant time frame; and members of the ACIM's legal and compliance departments. In addition, the Special Subcommittee subjected themselves to interviews aimed at evaluating their independence. Other non-defendant members of the ACWMF Board were also interviewed to establish their independence from the named defendants and the actions giving rise to Mr. Gomes' complaint.

Before conducting these interviews, the Special Subcommittee considered the advantages and disadvantages of allowing Mr. Sheridan and counsel for ACIM (whether in-house or outside counsel) to be present at or participate in the interviews. The Special Subcommittee determined that neither Mr. Sheridan, nor counsel for ACIM would be permitted to attend any interviews. The Special Subcommittee believed this course would facilitate more open and candid dialogue between the Special Subcommittee and witnesses. However, the Special Subcommittee did allow counsel for the individual defendants to attend, if so desired.

Each interview was attended by Ms. Lewis, Mr. Yates, or both. The Special Subcommittee's counsel also participated in each interview. The following is a chronological list of the interviews conducted by the Special Subcommittee:[22]

1.  June 6, 2014: Ms. Jennie Clarke, Associate General Counsel for ACIM
    Ms. Clarke was initially interviewed on June 6, 2014 by the Special Subcommittee's counsel to discuss data and document collection for the investigation. However, the Special Subcommittee has contacted Ms. Clarke multiple times through email, telephone, and in-person meetings to discover additional relevant information or to request additional documents. No summary was made of communications with Ms. Clarke.

2.  June 19, 2014: Mr. Chuck Etherington, General Counsel for ACIM
    This interview was in-person and took place at American Century's offices in Kansas City, Missouri. Ms. Lewis and the Special Subcommittee's counsel were present.

3.  June 19, 2014: Ms. Lewis
    This interview was in-person and took place at American Century's offices in Kansas City, Missouri. Ms. Lewis and the Special Subcommittee's counsel were present.

4.  June 25, 2014: Mr. Yates
    This interview took place telephonically. Mr. Yates and the Special Subcommittee's counsel were present.

5.  July 1, 2014: Mr. Sheridan, Mr. Gomes' counsel
    This interview was in-person and took place at Mr. Sheridan's office in New York City. Mr. Sheridan, Nico Herrera (co-counsel for Mr. Gomes), and the Special Subcommittee's counsel were present. No summary was made of Mr. Sheridan's interview.

6.  August 4, 2014: Mr. John Whitten
    This interview took place telephonically. Mr. Yates, the Special Subcommittee's counsel, and Ms. Marguerite Bateman (Mr. Whitten's counsel) were present.

7.  August 14, 2014: Mr. James Olson
    This interview took place telephonically. Ms. Lewis, the Special Subcommittee's counsel, and Ms. Marguerite Bateman (Mr. Olson's counsel) were present.

8.  September 4, 2014: Mr. Brady
    This interview was in-person and took place at American Century's offices in New York City. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

9.  September 4, 2014: Mr. Federico Laffan, an International Discovery analyst
    This interview was in-person and took place at American Century's offices in New York City. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

---

[22] Attached as "Appendix A" are memoranda summarizing the content of most of these interviews.

10. September 4, 2014: Geoff Burger, a quantitative analyst at ACIM
    This interview was in-person and took place at American Century's offices in New York City. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

11. September 5, 2014: Mr. Kopinski
    This interview was in-person and took place at American Century's offices in New York City. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

12. September 5, 2014: Anthony Han, an International Discovery analyst
    This interview was in-person and took place at American Century's offices in New York City. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

13. September 10, 2014: Mr. Brown
    This interview took place at American Century's offices in New York City. Ms. Lewis, Mr. Yates, the Special Subcommittee's counsel (by telephone), and Ms. Marguerite Bateman (Mr. Brown's counsel) were present.

14. September 15, 2014: Mr. Stowers III
    This interview was in-person and took place at American Century's offices in Kansas City, Missouri. Ms. Lewis and the Special Subcommittee's counsel were present.

15. September 16, 2014: Mr. Lyons
    This interview was in-person and took place at American Century's offices in Kansas City, Missouri. Ms. Lewis, Mr. Yates (by telephone), and the Special Subcommittee's counsel were present.

16. September 16, 2014: Mr. Thomas
    This interview was in-person and took place at American Century's offices in Kansas City, Missouri. Ms. Lewis, Mr. Yates (by telephone), and the Special Subcommittee's counsel were present.

17. September 22, 2014: Mr. Chang
    This interview was in-person and took place at the Janus Capital Group's offices in Denver Colorado. Ms. Lewis, Mr. Yates (by telephone), the Special Subcommittee's counsel, and Mr. Ben Klein (Mr. Chang's counsel) were present.

18. October 8, 2014: Ms. Strandjord
    This interview took place telephonically. Ms. Lewis, the Special Subcommittee's counsel, and Ms. Marguerite Bateman (Ms. Strandjord's counsel) were present.

19. October 9, 2014: Mr. Pratt
    This interview took place telephonically. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

20. October 9, 2014: Mr. Webster
    This interview took place telephonically. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

21. October 9, 2014: Ms. Hall
    This interview took place telephonically. Ms. Lewis, Mr. Yates, the Special Subcommittee's counsel, and Mr. Marguerite Bateman (Ms. Hall's counsel) were present.

22. October 21, 2014: Christine Rolli, Senior Manager in ACIM's compliance department
    This interview was in-person and took place at American Century's offices in Kansas City, Missouri. Ms. Lewis, Mr. Yates, and the Special Subcommittee's counsel were present.

In addition to those named above, the Special Subcommittee made efforts to interview Mr. Sayers. Yet, multiple attempts to secure a meeting proved fruitless. The Special Subcommittee ultimately found it unnecessary to interview him because it did not believe that Mr. Sayers possessed any knowledge or insights into the relevant issues beyond the extensive information already collected from other defendant directors.

## E.    Case Law Review

The Special Subcommittee also identified and examined case law touching on various issues, such as: the standards governing the Special Subcommittee's investigation; the legality or illegality of international internet gaming companies with a U.S. facing business (including cases forwarded by Mr. Sheridan); and the viability of the legal theories set forth in Mr. Gomes' complaint. In total, the Special Subcommittee and its counsel reviewed scores of cases addressing issues relevant to the investigation. Below is a sampling of the case law and court filings reviewed by the Special Subcommittee:

- *Boland v. Boland*, 423 Md. 296, 354 (2011).
- *Boland v. Boland*, No 273284-V, 2012 WL 10841803 (Md. Cir. Ct. June 8, 2012).
- *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006).
- *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001).
- *Nixon v. Interactive Gaming & Commc'ns Corp*., CV-97-7808, 1997 WL 33545763 (Mo. Cir. Ct. May 23, 1997).
- *Vacco v. World Interactive Gaming Corp*., 714 N.Y.S.2d 844 (N.Y. Co. Sup. Ct. 2000).
- *Seidl v. American Century Cos, Inc*., No. 10-4152-CV-W-ODS, 2014 WL 5463661 (W.D. Mo. July 2, 2014).
  - The Special Subcommittee also reviewed the parties' briefing on summary judgment which culminated in Judge Smith's July 2, 2014 Order, including:
    - Suggestions in Support of Defendants' Motion for Summary Judgment
    - Plaintiff's Suggestions in Opposition to Defendants' Motion for Summary Judgment
    - Reply Suggestions in Support of Defendants' Motion for Summary Judgment

21

- ▪ Plaintiff's Suggestions in Support of Plaintiff's Motion for Partial Summary Judgment
- ▪ Institutional Defendants Suggestions in Opposition to Plaintiff's Motion for Partial Summary Judgment
- ▪ Independent Director Defendants' Suggestions in Opposition to Plaintiff's Motion for Partial Summary Judgment
- ▪ Plaintiff's Reply Suggestions in Further Support of Plaintiff's Motion for Summary Judgment (Reply to Institutional Defendants' Oppositions Suggestions)
- ▪ Plaintiff's Reply Suggestions in Further Support of Plaintiff's Motion for Summary Judgment (Reply to Director Defendants' Opposition Suggestions)

- *Gomes v. American Century Companies., Inc.*, No. 10-0083-CV-W-SOW, 2012 WL 10831065 (W.D. Mo. Feb. 16, 2012).
- *Gomes v. American Century Companies, Inc*., 710 F.3d 811 (8th Cir. 2013).
- *McBrearty v. Vanguard Group, Inc.*, No. 08 Civ 7650(DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009).
- *Seidl v. American Century Companies, Inc*., 713 F. Supp. 2d 249 (S.D.N.Y. 2010).
- *Gamoran v. Neuberger Berman, LLC*, No. 11 Civ. 07957(TPG), 2013 WL 1286133 (S.D.N.Y. Mar. 29, 2013).
- *In re Mastercard Int'l, Inc. Internet Gambling Litig.*, 313 F.3d 257, 262 (5th Cir. 2002).
- *Hartsel v. Vanguard Group,* CIV.A.5394-VCP, 2011 WL 2421003 (Del. Ch. June 15, 2011).

**F.      Special Subcommittee Meetings**

During the investigation, the Special Subcommittee and its counsel met, with limited exceptions, on a weekly basis.  These meetings provided occasions for the Special Subcommittee to formulate an investigation roadmap; seek advice from counsel; discuss and assess collected information; receive status updates on assignments given to counsel; foresee and outline next steps; discuss the application of facts and law to the issues presented by Mr. Gomes' demand; and to outline the recommendations it now submits to the ACWMF Board.  Some meetings were held in-person and others were held telephonically.  For each meeting, counsel prepared minutes and sent them to the Special Subcommittee for approval.  Below is a list of dates on which the Special Subcommittee held a meeting during the course of the investigation:

1. June 17, 2014
2. July 9, 2014
3. July 16, 2014
4. July 23, 2014
5. July 30, 2014
6. August 6, 2014
7. August 13, 2014
8. August 20, 2014
9. August 27, 2014
10. September 17, 2014

11. September 24, 2014
12. October 8, 2014
13. October 15, 2014
14. October 21 & 22, 2014
15. October 29, 2014
16. November 12, 2014
17. November 19, 2014
18. November 24, 2014

## G.     Creation of a Chronology

The investments in Neteller and bwin occurred over a two-year period in 2005 and 2006. And the Special Subcommittee's investigation spans a period of over three years from 2004 through the first quarter of 2007. Given these expansive time periods, the Special Subcommittee generated a chronology to summarize and contextualize factually important events. This chronology is attached to this report as Appendix B.

One principal objective drove the chronology's creation. The Special Subcommittee wanted to recreate the International Discovery team's exposure to the investment community's views and ideas on the advisability of purchasing online gaming stocks. To this end, the chronology shows documents and information received by International Discovery personnel from various analysts and firms interested in online gaming. Using this tool, the Special Subcommittee developed a more comprehensive understanding of the investment community's perspectives on online gaming securities in the 2004–2007 period.

The Special Subcommittee also used the chronology to determine what information was shared with the ACWMF Board, when that information was shared, and what actions, if any, the ACWMF Board took as it relates to the Fund's decision to invest in Neteller and bwin during the 2004-2007 period.

# V. FACTUAL FINDINGS

## A.     International Discovery

International Discovery has operated since April 1994[23] and seeks capital growth as its overarching investment objective.[24] The portfolio managers pursue this objective by identifying stocks of companies that they believe will increase in value over time. Thus, investment decisions are based primarily on analysis of individual companies, rather than on broad economic forecasts.[25] And International Discovery operates on the premise that global markets are ineffective, especially for smaller, less followed companies, and thus, an active strategy in

---

[23]TWEGX International Discovery Fund, https://www.americancentury.com/content/americancentury/direct/en/investment-products/mutual-funds/mutual-fund-details/summary/international-discovery.html#TWEGX.

[24] Fund Prospectus (March 31, 2005).

[25] Fund Prospectus (March 31, 2005).

the smaller capitalization range will beat a passive strategy over time.[26]  During the 2005 to 2006 time frame, International Discovery looked to outperform its peer group and its benchmark index, S&P/Citi EMI World Growth ex-U.S.

The Fund's assets are invested primarily in equity securities of companies that are small- to medium-sized at the time of purchase and are located in foreign developed countries or emerging market countries.[27]  However, if portfolio managers determine that the available small- to medium-sized companies are inadequate to meet the Fund's investment needs, the Fund may invest in medium- to large-sized companies.[28]  Also, the Fund is diversified as defined by the Investment Company Act of 1940, meaning that, with respect to 75% of its total assets, it does not invest more than five percent of its total assets in the securities of a single issuer or own more than ten percent of the outstanding voting shares of a single issuer.[29]

As a fund that invests in foreign markets, International Discovery faces unique risks, including: increased exposure to political, social, and economic events in world markets; limited availability of public information about a company; less-developed trading markets and regulatory practices; and a lack of uniform financial reporting practices similar to those used in the United States.[30]  And because the Fund invests in smaller foreign stocks, these risks may be particularly pronounced.  In addition, because International Discovery investments are typically denominated in foreign currencies, the Fund may experience gains and losses based solely on changes in currency exchange rates.[31]

## B.  History of International Discovery's Investments in Neteller and bwin

### Neteller

International Discovery's investment in Neteller was confined to 2005.  The Fund's initial shares were purchased in late-January 2005.  Additional shares were purchased on various dates through late-April 2005.  The Fund divested some of its Neteller shares in late-May 2005 but retained a significant portion of its stake for several more months.  In late-October 2005, International Discovery sold its remaining shares for a net profit.  Table 1 below offers a detailed look at the transactional history of International Discovery's investment in Neteller.

**Table 1--Transactional History of International Discovery's Neteller Investment**

| Trade Date | Transaction Type | Number of Shares | (Cost)/Proceeds (£) |
|---|---|---|---|
| January 26, 2005 | Buy | 39,430 | (162,751.96) |
| January 27, 2005 | Buy | 228,984 | (1,009,210.37) |
| January 28, 2005 | Buy | 19,716 | (95,630.43) |

---

[26] Supplemental Fund Performance Review Committee Materials submitted by International Discovery (March 1, 2006).

[27] Fund Prospectus (March 31, 2005).

[28] Fund Prospectus (March 31, 2005).

[29] Fund Statement of Additional Information (March 31, 2005).

[30] Fund Prospectus (March 31, 2005).

[31] Fund Prospectus (March 31, 2005).

| February 15, 2005 | Buy | 39,088 | (248,716.23) |
|---|---|---|---|
| February 15, 2005 | Buy | 27,264 | (173,067.68) |
| February 16, 2005 | Buy | 54,235 | (339,109.38) |
| February 16, 2005 | Buy | 256,283 | (1,616,322.42) |
| February 25, 2005 | Buy | 63,000 | (379,729.37) |
| March 15, 2005 | Buy | 45,007 | (314,318.41) |
| March 16, 2005 | Buy | 17,193 | (119,898.90) |
| April 28, 2005 | Buy | 160,000 | (742,964.28) |
| May 19, 2005 | Sell | (75,247) | 380,790.63 |
| May 20, 2005 | Sell | (255,153) | 1,286,846.57 |
| October 19, 2005 | Sell | (619,800) | 4,034,021.42 |
| | | | **499,939.19** |

*bwin*

Like its investment in Neteller, International Discovery opened and closed its position in bwin within the course of a single year—2006. International Discovery acquired its initial bwin shares in late-January 2006 and continued acquiring shares through mid-June 2006. In late-June 2006, the Fund sold a portion of its shares. However, in late-June and early-August 2006, International Discovery purchased additional shares. The full inventory of bwin shares was then sold in late-September 2006 for a net loss. Table 2 below offers a detailed look at the transactional history of International Discovery's investment in bwin.

**Table 2--Transactional History of International Discovery's bwin Investment**

| Trade Date | Transaction Type | Number of Shares | (Cost)/Proceeds (€) |
|---|---|---|---|
| January 19, 2006 | Buy | 5,345 | (493,794.62) |
| January 20, 2006 | Buy | 20,497 | (1,906,535.82) |
| January 23, 2006 | Buy | 8,158 | (747,949.91) |
| January 26, 2006 | Buy | 10,587 | (974,901.80) |
| January 27, 2006 | Buy | 10,413 | (969,671.79) |
| February 9, 2006 | Buy | 15,000 | (1,447,241.71) |
| March 2, 2006 | Buy | 25,000 | (2,433,815.41) |
| March 9, 2006 | Buy | 20,000 | (1,914,757.87) |
| April 27, 2006 | Buy | 13,700 | (1,413,898.86) |
| June 20, 2006 | Buy | 6,429 | (418,720.77) |
| June 27, 2006 | Sell | (36,052) | 2,423,202.82 |
| June 28, 2006 | Sell | (6,977) | 439,182.98 |
| June 29, 2006 | Buy | 45,000 | (2,502,346.20) |
| August 3, 2006 | Buy | 49,400 | (1,477,489.68) |
| September 21, 2006 | Sell | (21,861) | 404,317.79 |
| September 22, 2006 | Sell | (98,043) | 2,005,900.87 |
| September 25, 2006 | Sell | (66,596) | 1,421,307.15 |
| | | | **(10,007,212.83)** |

C.    **The Value of Investments in Neteller and bwin Compared with the Fund's Overall Value**

Neteller and bwin were insignificant holdings in International Discovery. At all times, each security accounted for less than 1% of the Fund's overall value. And each security's mean percentage value—over the course of International Discovery's position in it—was, in reality, closer to .5% of the Fund's overall value. The information and graphs below give a closer look at the value of the two investments in relation to International Discovery's total value in 2005 and 2006.

*Neteller*

During the period in which International Discovery held Neteller stock, the Fund averaged a value of $1,241,029,822.56. During that same period, the Fund's Neteller stake averaged a value of $8,091,250.93. Thus, in percentage terms, the value of the Fund's Neteller position averaged a mere .65% of International Discovery's value during 2005. Even at the point at which Neteller accounted for its largest share of the Fund's value, it only accounted for .83% (see Figure 1).



Figure 1

*bwin*

During the period in which International Discovery held bwin stock, the Fund averaged a value of $1,579,726,409.81. During that same period, the Fund's bwin stake averaged a value of $9,916,771.24. Thus, in percentage terms, the value of the Fund's bwin position averaged a mere .63% of International Discovery's value during 2006. Even at the point at which bwin accounted for its largest share of the Fund's value, it only accounted for .91% (see Figure 2).

26



**Figure 2**

## D. Net Gains/Losses on Investments

*Neteller*

When International Discovery exited its position in Neteller in late-October 2005, it realized a net gain of £499,939.19. Utilizing the conversion factor of 1.76650 USD/GBP, which was the approximate conversion rate on the settle date of the final sale of International Discovery's Neteller shares (October 24, 2005),[32] this equates to a net gain of approximately $883,143.

*bwin*

When International Discovery completely sold-off its bwin shares in late-September 2006, it realized a net loss of €10,007,212.83. Utilizing the conversion factor of 1.2693 USD/EUR, which was the approximate conversion rate on the settle date of the final sale of International Discovery's Neteller shares (September 28, 2006),[33] this equates to a net loss of approximately $12,702,200.

## E. International Discovery's Overall Performance During 2005 and 2006

A main advantage of a mutual fund, such as International Discovery, is that it gives small investors access to professionally managed, diversified portfolios of equities, bonds, and other securities that would be difficult—if not impossible—for the investor to recreate. Investors purchase shares of a fund, not the underlying securities, and participate in a fund's gains and losses proportionate to the number of fund shares they hold. Investors in International Discovery, during the period in which the Fund held bwin and Neteller stock, received high returns on their investments. Indeed, during the course of its stake in Neteller (Jan. 26, 2005 through Oct. 19, 2005), the Fund's share price increased in value from $13.14 to $14.56, or a

---

[32]The conversion rate was obtained from the "Currency Converter" at http://www.oanda.com/currency/converter/.
[33]The conversion rate was obtained from the "Currency Converter" at http://www.oanda.com/currency/converter/.

gain of 10.8%. Likewise, during the course of its stake in bwin (Jan. 19, 2006 through Sept. 25, 2006), the Fund's share price increased in value from $15.27 to $16.22, or a gain of 6.2%. And overall, from the Fund's initial purchase of Neteller shares (Jan. 26, 2005) to its final sale of its bwin shares (Sept. 25, 2006), International Discovery's share price increased significantly from $13.14 to $16.22, or a gain of 23.4% (see figure 3).



**Figure 3**

## F.    The ACWMF Board's Role in International Discovery's Operations

As is still true today, the investment advisor, ACIM, and its employees provided the day-to-day management of International Discovery's investment business during the 2005 to 2006 time frame. The ACWMF Board's role was, therefore, limited to high-level oversight of ACIM's operations. As is typical in the mutual fund industry, it approved an annual management contract with ACIM and conducted regular reviews of International Discovery's performance and ACIM's adherence to various processes and controls.

During the relevant time period, the ACWMF Board used its Fund Performance Review Committee (the "Committee") to conduct periodic reviews of each fund it issued, including International Discovery. However, these reviews were macro-level reviews of a fund's performance, processes, and personnel. For example, the Committee scrutinized a fund's returns, levels of overall financial risk (*e.g.*, deviation from applicable benchmarks), and other general performance metrics, such as comparisons of a fund's returns to peer groups and benchmarks. A portfolio's construction (*e.g.*, sector or industry weightings) was also a topic of discussion at the Committee level.

At times, the Committee would place a fund on a "watch list." However, the placement of a fund on the watch list was done objectively. Only a fund's failure to meet very specific

performance criteria or a change in fund personnel, such as a new portfolio manager, would cause a fund to be listed on this watch list. After performance improved or, in the case of new fund personnel, a certain amount of time had lapsed, a fund would be taken off the watch list. In some cases, the Committee asked funds on the watch list to make more frequent reports to the ACWMF Board regarding to their performance and plans for improvement.

Although it provided oversight and heard presentations from portfolio managers, the ACWMF Board did not focus on a fund's specific holdings. Nor did it receive schedules of a fund's investments. Typically, the ACWMF Board was apprised only of a fund's top ten holdings. On some occasions, portfolio managers would discuss an individual security during a presentation, especially if it was a major promoter or detractor of a fund's performance. In short, scrutiny, or even awareness of a fund's individual holdings, was not an ACWMF Board function or topic of discussion.

On a similar note, the ACWMF Board did not have any involvement in any fund's investment decisions, including the decisions made by International Discovery. There was no mechanism, whether formal or informal, for ACWMF Board to approve, discuss, vote on, or otherwise weigh in on which securities a fund, such as International Discovery, could or should purchase. Those decisions, while cumulatively critical, always remained in the portfolio managers' discretion—subject only to limitations set forth in a fund's prospectus, statement of additional information, financial industry regulatory parameters, etc. As one would expect, the ACWMF Board left purchase decisions to the portfolio managers who rigorously and analytically vetted prospective securities. The ACWMF Board concentrated its efforts on ensuring that portfolio managers, and ACIM generally, followed sound investment practices and complied with operational and compliance processes and controls.

Two key reasons explain the ACWMF Board's detachment from purchase decisions and knowledge of individual holdings. As a practical matter, the ACWMF Board's role is focused on governance and oversight, not operations. The ACWMF Board employs ACIM, through annual management agreements, to purchase and sell securities that will advance the funds' objectives. Also, the ACWMF Board's involvement in buying and selling individual securities could place its members in a position of having insider knowledge. Thus, as a policy matter, discussions about individual stocks and individual security purchases are discouraged.[34]

## G.     ACWMF Board's Exposure to International Discovery, Neteller, and bwin

### *International Discovery*

In 2005 and 2006, the ACWMF Board's oversight of International Discovery did not stray from the paradigm described above. Throughout 2005, International Discovery was on the ACWMF Board's "watch list" for reasons related to both performance and personnel.[35] In December 2005, the Fund Performance Review Committee requested monthly reports from the

---

[34] *See* Appendix A, Summary of Thomas Brown's Interview.
[35] *See* Materials presented to the Investment Oversight Committee at its February 14, 2005, April 29, 2005, and August 9, 2005 meetings; Monthly Independent Directors' Updates dated January 13, 2006.

Fund. In January 2006, Mr. Kopinski, the Fund's portfolio manager, submitted a monthly report describing the Fund's December performance and listing a few securities that performed well, in addition to one security that detracted from performance. Neither the Fund's past position in Neteller, nor a preview of the Fund's potential position in bwin was mentioned. At the March 2006 meeting of the Fund Performance Review Committee, International Discovery was removed from the watch list.[36]

At that same March 2006 meeting, Mr. Kopinski gave a presentation about International Discovery. Mr. Kopinski's furnished a high-level synopsis of the Fund's genesis, investment team, investment philosophy and process, financial risk controls (*e.g.*, diversification, exposure to emerging markets, industry weightings), total returns for various periods, other portfolio characteristics relative to its benchmark, top ten holdings, sector allocation, and country allocation.[37] The materials presented to the Fund Performance Review Committee had no reference to either Neteller or bwin. Likewise, no mention of Neteller or bwin was made in Mr. Kopinski's oral presentation or the committee discussion that ensued. As was typical with fund presentations, the topics of the Fund's purchase decisions and individual holdings were absent from the conversation.

*Neteller*

None of the individual defendants, except for Mr. Kopinski and Mr. Brady, knew of or participated in International Discovery's decision to invest in Neteller. Nor were they expected to. One defendant, Mr. Chang, was not even employed by ACIM when the Fund exited its position in Neteller in October 2005.[38] The individual defendants' only possible exposure to the Fund's investment in Neteller was in three required SEC filings. Neteller was listed as an International Discovery holding in ACWMF's 2005 Semiannual Report and ACWMF's first and third quarter 2005 Form N-Q filings.[39] But even if a defendant saw Neteller listed in these filings, no more than the Neteller name was provided. None of these reports included commentary on Neteller or identified its business. Thus, any defendant's (except Mr. Kopinski's and Mr. Brady's) exposure to Neteller was superficial and perfunctory.

*bwin*

Like Neteller, none of the individual defendants, except for Mr. Kopinski and Mr. Brady, knew of or participated in International Discovery's decision to invest in bwin. Individual defendants were potentially exposed to bwin—as merely a holding in International Discovery— in three SEC filings: ACWMF's 2006 Semiannual Report and ACWMF's first and third quarter 2006 Form N-Q filings.[40] As with Neteller, any exposure would have been purely mechanical.

---

[36] Minutes of the Fund Performance Review Committee (March 1, 2006).
[37] Supplemental Fund Performance Review Committee Materials submitted by International Discovery (March 1, 2006).
[38] Mr. Chang only began working for ACIM in late-March 2006.
[39] ACWMF Certified Semiannual Shareholder Report (August 5, 2005); ACWMF 1st Quarter Form N-Q (filed April 28, 2005); ACWMF 3rd Quarter Form N-Q (filed October 28, 2005).
[40] ACWMF Certified Semiannual Shareholder Report (August 4, 2005); ACWMF 1st Quarter Form N-Q (filed April 4, 2006); ACWMF 3rd Quarter Form N-Q (filed October 26, 2006).

30

Only on one other occasion—and only after the Fund had exited its position—were some of the defendant directors exposed to bwin and its status as an International Discovery holding. In mid-September 2006, bwin's shares were suspended from trading after the company's co-CEOs were detained by French authorities for alleged violations of laws protecting France's state-owned gambling monopoly. In accordance with proper procedures, the ACIM's Valuation Committee promptly met and assigned a fair value to the security.[41] In conjunction with the November 2006 meeting of the ACWMF Board's Audit Committee, ACIM's Valuation Committee submitted a report listing bwin as one of the securities that had been recently fair-valued. The report simply listed bwin in line-item fashion with other related valuation information.[42] The report noted that bwin was an International Discovery holding, but no other information related to bwin's business or stock performance was presented to the Audit Committee.

## H.     Decision to Purchase and Sell Neteller and bwin

As noted above, International Discovery's portfolio managers make all purchase and sale decisions with respect to the Fund's holdings. There is no formal or informal process whereby portfolio managers must seek counsel or approval before purchasing or selling a security—whether from the Chief Investment Officer, ACIM management, the legal or compliance departments, or the ACWMF Board. While portfolio managers may consult non-Fund personnel regarding a purchase or sale, this is not standard practice. With respect to Neteller and bwin, Mr. Kopinski and/or Mr. Brady alone made the decisions to buy and sell these securities. No evidence was found to suggest that these decisions were anything more than standard, internally-made Fund transactions. In brief, the purchase and sale decisions were not influenced by, nor did they include, any of the individual defendants (except Mr. Kopinski and Mr. Brady) or any other ACIM employee.

Because International Discovery was permitted to purchase securities in foreign developed countries, European companies, such as Neteller and bwin, were obvious and frequent targets for acquisition. Indeed, per Mr. Kopinski, International Discovery focused on European businesses.[43] Both Neteller and bwin were purchased because they met the Fund's investment objectives as revenue growth stocks.

As discussed in greater detail in Section VII.D., *infra*, Fund personnel did not have concerns about the legality of the transactions. As a general matter, there is an industry presumption that stocks offered on regulated, public exchanges, both foreign and domestic, are legally available for purchase. Neteller's business raised no alarms because Fund personnel understood that Neteller was not an online gaming site, but rather an internet payment system that, among other things, serviced gaming websites. As for bwin, Fund personnel were not concerned because 1) bwin was a European company, whose primary market was Europe, and whose projected growth in European operations were the Fund's principal interest; and 2) they understood that bwin did not have any U.S. customers because it had implemented filters to

---

[41] September 18, 2006 Minutes of ACIM's Valuations Committee.
[42] Valuations Committee Report submitted at the Audit Committee Meeting of November 29, 2006.
[43] Appendix A, Summary of Mr. Kopinski's Interview.

prevent U.S. customers from placing bets.[44]  bwin's 2005 annual report lends significant credit to this belief because it does not disclose any U.S. operations or customers.[45]

In addition, nothing suggests that the Fund sold its Neteller and bwin holdings because of U.S. legal concerns.  The Fund sold a particular stock for a variety of reasons, including: company misses profit expectations; the company changes business models; the stock has reached maximum performance; or the risk-reward balance shifts; or the portfolio managers identify more promising opportunities.[46]  By all accounts, the Fund's Neteller stock was sold because it failed to meet its growth target or something impaired its earnings.  In regards to bwin, the Fund began selling shares in late-June 2006 because of financial performance measures.[47]  The Fund sold its remaining shares in September 2006 because of the detention, by French authorities, of company executives.  This event caused Fund personnel to reassess the company's business model.  It made sense to divest the holding given the company's troubles with its core, European business—the key business driving International Discovery's investment.[48]  In their interviews, the portfolio managers made clear that the legality of online gaming in the U.S. did not factor into the decision to invest in bwin or Neteller.

# VI.  ISSUES ADDRESSED

In order to determine the appropriate issues to address, the Special Subcommittee conducted a thorough review of Mr. Gomes' complaint and met (through counsel) with Mr. Gomes's counsel to ensure a full understanding of the factual assertions and legal theories in the complaint.  The Special Subcommittee determined that the causes of action asserted in Mr. Gomes' complaint all are premised on the following theories:

1. At the time International Discovery made the investments in Neteller and bwin, these companies were violating federal law, namely 18 U.S.C. Section 1955, and were, accordingly, "illegal gambling business[es]" as defined in Section 1955(b).

2. By investing in an "illegal gambling business," International Discovery and ACWMF violated 18 U.S.C. Section 1955, because, by investing in such an entity, International Discovery and ACWMF "own[ed] all or part of an illegal gambling business."

Each count in Mr. Gomes' complaint is premised on the theory that International Discovery/ACWMF invested in illegal gambling businesses, and four of the six counts (Counts 1, 2, 5, and 6) are premised on the theory that International Discovery and/or ACWMF committed criminal violations by investing in illegal gambling businesses.  Moreover, Mr. Gomes asserts that "the illegality of Internet gambling was well-established before Defendants made the investments at issue,"[49] and that, prior to making their investments, "Defendants knew

---

[44] Appendix A, Summaries of Mr. Brady and Mr. Han's Interviews.
[45] bwin's Annual Report 2005.
[46] Appendix A, Summary of Mr. Brady's Interview.
[47] Appendix A, Summary of Mr. Kopinski's Interview.
[48] *See* Appendix A, Summary of Mr. Kopinski's Interview.
[49] Complaint, ¶ 2.

that purchasing Neteller shares violated U.S. criminal laws,[50]" and "Defendants knew that purchasing bwin's shares violated Section 1955."[51]

Based on its understanding of the factual and legal theories alleged by Mr. Gomes, the Special Subcommittee set forth to address the following issues:

1. At the time International Discovery invested in Neteller and bwin, were Neteller and bwin violating any U.S. laws?

2. If so, did International Discovery violate 18 U.S.C. Section 1955, or any other federal laws, by purchasing publicly traded shares of Neteller and bwin?

3. If so, did International Discovery or any of its agents know that purchasing Neteller and bwin shares violated 18 U.S.C. Section 1955?

4. If so, is it in the best interests of ACWMF to pursue any of the claims set forth in Mr. Gomes's complaint or any related claims not pleaded in the complaint?

# VII. FINDINGS AND RECOMMENDATIONS

## A.    Preliminary Note Regarding Neteller

Mr. Gomes' allegations relate to the investments by International Discovery in both Neteller and bwin. As an initial measure, as described in Section V.B., *supra*, the Subcommittee analyzed the trading records for both Neteller and bwin. International Discovery's investments in Neteller, which began in January 2005 and were completed in October 2005, resulted in a net gain. The net proceeds of the Neteller investments amounted to £499,939.19. As explained in Section V.D., *supra*, this equates to a net gain of $883,143.

In his complaint, Mr. Gomes alleges that ACWMF was injured as a proximate cause of the investments in Neteller and suffered "substantial damages," but, in contrast to the allegations relating to bwin,[52] he does not allege a specific loss, in monetary terms or in terms of percentage of the overall investment. This is consistent with what is reflected in the trading records—that there was a net gain on the Neteller investments. Even if the Special Subcommittee were to find that Neteller was violating a federal law and that International Discovery also broke the law by investing in Neteller, there was no cognizable injury to the Fund or to ACWMF that resulted from these investments. Accordingly, because there exists no injury to the corporation, the hallmark of a derivative suit, the allegations relating to the investments in Neteller do not support a derivative claim by ACWMF against any of the named defendants (or any other parties).

The analysis below relating to Issues One, Two, Three, and Four will therefore focus on the factual circumstances relating to the investments in bwin and will omit specific discussion of the Neteller investments. The general conclusions regarding the legality or illegality of internet

---

[50] *Id.* at ¶ 3.
[51] *Id.* at ¶ 5.
[52] *Id.* at ¶ 23.

33

gaming during this time frame and investing in internet gaming-related companies, however, would apply equally to Neteller.

**B.    Issue One: At The Time International Discovery Invested In bwin, Was bwin Violating Any U.S. Laws?**

The allegations in Mr. Gomes' complaint relate to investments in bwin that were made in 2006—over eight years ago.  The Special Subcommittee determined that its assessment of the legal status of online gaming should, therefore, be based on information that was available during the 2006 time period.  The Special Subcommittee reviewed case law decided in or prior to 2006, including case citations provided by counsel for Mr. Gomes,[53] and reviewed the federal government's enforcement efforts relating to internet gaming, including the examples cited in Mr. Gomes' complaint.  Additionally, in an effort to determine the public perception of the status of the law at that time, as well as the perception of the investment industry more specifically, the Special Subcommittee reviewed documents from the 2004-2006 time frame, including documents that were in the possession of International Discovery portfolio managers and analysts, such as analyst reports, press articles, and updates on legislative developments.  The Special Subcommittee's detailed fact chronology, attached as Appendix B, contains representative excerpts of what was being written in those reports and articles relating to internet gaming generally, and, in some instances, bwin specifically.

After a thorough review of the case law, government enforcement actions, and contemporaneous analyst reports and articles, it is the Special Subcommittee's view that the law relating to internet gaming was unsettled in the 2006 time frame.  The Special Subcommittee, accordingly, is unable to conclude that bwin was violating any U.S. laws at that time.

*Relevant Case Law*

The Special Subcommittee requested that counsel for Mr. Gomes provide citations to cases, decided in or prior to 2006, where a court had addressed the issue of legality or illegality of offshore entities operating gambling websites that permitted U.S. customers to place bets over the internet.  Mr. Gomes's counsel provided the following case cites: *Nixon v. Interactive Gaming & Comm. Corp.*, No. CV97-7808, 1997 WL 33545763 (Mo. Cir. May 23, 1997); *Vacco v. World Interactive Gaming Corp.* 714 N.Y.S. 2d 844 (1999); *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); and *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006).

*Nixon* did not address issues of federal law.  In *Nixon*, the court held that a company incorporated in Grenada, with operations in Pennsylvania, that took casino and sports bets from Missouri residents, was operating in violation of the Missouri Merchandising Practices Act.[54]

In *Vacco¸* a trial court in New York held that a foreign corporation that operated an offshore casino that offered gambling (virtual slots, blackjack, and roulette) to New York

---

[53] Email from Mr. Sheridan to Mr. Maria (July 24, 2014, 19:27 EST).
[54] *Nixon*, 1997 WL 33545763, at *5.

residents through the internet violated New York law and issued an injunction.[55]  Although the company was located in Antigua, where gambling was legal, the New York statute at issue provided that, "if the person engaged in gambling is located in New York, then New York is the location where the gambling occurred."[56]  The *Vacco* court expressed its view that offshore internet gambling operations also ran afoul of federal laws, including the Wire Act, the Travel Act, and the Paraphernalia Act.

The following year, Jay Cohen, the founder and operator of a sports betting operation located in Antigua, was convicted in the Southern District of New York of violating the Wire Act.[57]  In 2001, the Court of Appeals affirmed the conviction, finding, among other things, that the safe harbor in the Wire Act did not apply because, although betting was legal in Antigua, it was illegal in New York.[58]

In 2002, another federal Court of Appeals addressed the applicability of the Wire Act to internet gambling and found that the Wire Act applied only to gambling on sports events and did not prohibit other online gambling, such as casino games or poker.[59]  This decision was not at odds with the *Cohen* decision, as Cohen's website was a sports betting website.  In fact, in 2011, the DOJ publicly altered its view on the applicability of the Wire Act and, based on an opinion from the Department's Office of Legal Counsel, "concluded that it is limited only to sports betting."[60]

Plaintiff's counsel also directed the Special Subcommittee to the 2006 *Gotti* decision, which applied 18 U.S.C. Section 1955.  In *Gotti*, the defendants operated a "local branch" in New York of a company in Costa Rica that took sports bets.[61]  While the court found that Section 1955 applied in that case because the bets were placed in New York, even though they were received in Costa Rica, where gambling was legal,[62] there is no discussion of internet gambling in *Gotti*.[63]  Instead, the bettors would place their bets at this "local branch" in New

---

[55] *Vacco*, 714 N.Y.S.2d at 861-63.
[56] *Id.* at 859 (*citing* N.Y. Penal Law Section 225.00[2]).
[57] 18 U.S.C. Section 1084
[58] *See Cohen*, 260 F.3d 68, 73-74.
[59] *In re Mastercard Int'l, Inc. Internet Gambling Litig.*, 313 F.3d 257, 262 (5th Cir. 2002).
[60] *See* Letter from Deputy Attorney General James M. Cole to William J. Murray, December 23, 2011.  The opinion from the Office of Legal Counsel is available on the Department of Justice website at http://www.justice.gov/sites/default/files/olc/opinions/2011/09/31/state-lotteries-opinion_0.pdf
[61] *Gotti*, 459 F.3d at 340.
[62] *Id.* at 340-41.
[63] On December 9, 2014, counsel for the Special Subcommittee provided the ACWMF Board a summary of the relevant case law pertaining to internet gambling, including the cases to which counsel for Mr. Gomes directed the Special Subcommittee.  In discussing the *Gotti* case, which applied 18 U.S.C. Section 1955, counsel noted that, while the sports bets in *Gotti* ultimately were transmitted through the Internet, the Court's focus in *Gotti* was the fact that the bets were physically placed in New York at the local branch of a sports book business.  The bettors themselves were not placing sports bets via the Internet; accordingly, the Special Subcommittee interpreted *Gotti's* holding as not resolving the issues of "internet gambling," as reflected above.

York, and the gambling records were maintained in New York. Thus, this decision was inapplicable to, and added no clarity to, the legal status of internet gambling as reflected in the case law during the relevant time period.

This was, in essence, the status of the case law on internet gambling through 2006. Several states had held that it violated the laws of their states, and two federal courts had held that internet "sports books," but not other forms of internet gambling, violated the Wire Act. No federal court had addressed the applicability of 18 U.S.C. Section 1955 to internet gambling, whether it is in the context of sports betting, casino gaming, or poker.

### *Contemporaneous Articles and Events*

The chronology, attached as Appendix B, provides a detailed composition, based upon the Special Subcommittee's investigation, of how the press and the financial industry contemporaneously viewed the legal landscape as it related to internet gambling. As previously noted, the vast majority of the sources cited in the chronology were from materials that were in the possession of the relevant International Discovery employees in 2005-2006. Stated simply, this is the information that International Discovery had in its possession when it made the investment decisions regarding bwin.

The articles and analyses cited in the chronology make clear that there was, in fact, no clarity regarding the legality of internet gaming. While multiple sources reported that the DOJ viewed all forms of online gambling as illegal, beyond the cases described above (relating to sports betting), the issue of other forms of internet gambling had not been presented to, or decided by, any federal court. Most sources viewed the legality of these other forms of internet gambling as a grey area, and there had been repeated efforts in Congress to pass a law that would clarify the internet gambling issue, all of which had failed.

For example, a Merrill Lynch report from March 2005 noted that sports betting was illegal in the U.S., but "[t]he reason that online gaming is legal is due to a loophole in the legislation governing the above. In other words, the legality of it is a bit of a grey area."[64]

From an international perspective, a World Trade Organization ruling added support to the view that internet gaming was likely to be legalized. An April 2005 report from Morgan Stanley explained that "[a] landmark ruling from the World Trade Organisation has opened the way for Americans to gamble online legally, paving the way for potentially massive growth among offshore 'virtual' casinos, sportsbooks and poker rooms around the globe."[65]

A December 2005 Morgan Stanley report relating to Sportingbet, an online sports book, noted that Sportingbet "remains comfortable with the regulatory outlook, and sees only limited

---

[64] LSBD_CTRL_00020637. Citations using this convention (LSBD_CTRL_Number) are to custodial documents collected in the course of the Special Subcommittee's investigation.
[65] LSBD_CTRL_00021851.

prospects of it changing. Congressman Leach and Senator Kyl plan to introduce their 9th attempt to block online gambling, but we do not think it will be successful."[66]

In February 2006, shortly after International Discovery made its initial purchases in bwin shares, another Morgan Stanley report explained: "Regulation of the online gaming industry in the U.S. is a complicated and controversial issue. The recent escalation in activity in the House of Representatives and the Senate has increased the volatility of the stocks in the sector, and reminded investors of the risks of owning shares in companies that operate in a grey legal area. Major changes unlikely."[67]

During the same month, a Citigroup report explained: "Regulatory risk is unlikely to go away in the short term, but we do not believe that Goodlatte will be successful in banning online gambling via the Wire Act. Even in the event of a ban we question the enforceability of such a law change to the companies incorporated outside the U.S."[68]

As reflected by the materials possessed by the International Discovery analysts and portfolio managers, there was at least one individual in the industry who expressed the opinion that internet gambling violated U.S. laws. In 2005 and 2006, UBS analyst Will Robins emailed International Discovery employees and advised that internet gambling companies, including poker and casino gambling cites, were violating, or aiding and abetting violations of, U.S. laws.[69] The confusion in the industry is reflected even in the emails from Robins. Less than two weeks after sending an email claiming that companies in the online gaming industry were aiding and abetting breaches by American individuals of various U.S. laws, Robins sent a seemingly contradictory email, noting that "[t]here is 100% consensus in London that the USA will not do anything to enforce the legislation that makes internet gambling in the [sic] illegal . . . As long as this persists, institutions will continue to buy the shares and they will continue to perform."[70] At the same time, his email makes clear that his employer, major investment house UBS, covered, and, in fact, recommended, several of these gaming stocks.[71] Just two days later, Robins sent another email, opining that online sports betting is illegal and, unlike online casinos or poker, is not "grey."[72]

On July 17, 2006, David Carruthers, the CEO of BetOnSports.com, an online sports betting website that took bets from U.S. customers by internet and phone and advertised in the U.S., was arrested while changing flights at the Dallas airport. The next day, the Department of Justice announced the unsealing of an indictment against Carruthers and ten other individuals associated with BetOnSports, charging racketeering, conspiracy, and fraud, with the primary object of the conspiracy being violation of the Wire Act.[73]

---

[66] LSBD_CTRL_00037913.
[67] LSBD_CTRL_00043965.
[68] LSBD_CTRL_00044094.
[69] LSBD_CTRL_00020841; LSBD_CTRL_00026593.
[70] LSBD_CTRL_00027205.
[71] *Id.*
[72] LSBD_CTRL_00027387.
[73] LSBD_CTRL_00057680.

Even after the BetOnSports arrest and indictments, as reflected in the materials received by International Discovery analysts and portfolio managers at the time, the industry viewed these actions as pertaining to sportsbooks only and not to online casinos or poker.  For example:

- An analyst at Numis Securities suggests that "other Internet sportsbooks could be targeted" but notes that certain related actions by the FBI relating to telephone companies "raise[] the possibility that poker sites and not being viewed as 'illegal commercial gambling' by the DOJ."[74]
- An analyst at Collins Stewart opined: "In our opinion this is likely to be at worst a crackdown on US facing sportsbooks which are illegal under the Wire Act (i.e. it is unlikely to extend to online casino and poker operators).  Further, it may only be a company specific issue principally relating to the founders of BETonSPORTS."[75]
- An analyst at Investsec Bank opined: "It reinforces our view that the current indictments are [BetOnSports] specific and that the DoJ [sic] will only go after companies that pursue 'other' illegal activities, in addition to online gambling."[76]

### bwin's U.S. Operations

Prior to bwin's acquisition of Ongame in March 2006, bwin was predominantly a sports betting website.[77]  Prior to the Ongame acquisition, bwin's public filings did not reflect *any* U.S.-based customers.[78]  Moreover, bwin's public filings indicated that, both before and after the Ongame acquisition, bwin did not offer any sports betting products to U.S. citizens: "In view of the fact that *bwin* does not offer any sports betting products to US citizens, the *bwin* Group is not affected by the current investigations into BetonSports."[79]  Although the referenced report was not among the materials collected from International Discovery analysts or portfolio managers, as discussed below in Section VII.D., during the Subcommittee's interviews, several of the analysts and portfolio managers expressed the belief that bwin did not advertise its sports betting services to, or take sports bets from, U.S.-based customers and that bwin had "filters" in place to prevent such bets.

Mr. Gomes' complaint does not appear to allege that bwin, at any time, offered sports betting via internet or telephone to U.S.-based customers.  Instead, Mr. Gomes appears to assert that liability arose as a result of the Ongame acquisition (or prior to the acquisition, but having knowledge that the transaction would occur) and the casino and poker games that were offered to U.S.-based customers subsequent to the acquisition.[80]

---

[74] LSBD_CTRL_00057653.
[75] LSBD_CTRL_00057799.
[76] LSBD_CTRL_00058639.
[77] As reflected in the bwin Annual Report 2005, prior to the Ongame acquisition, the company did offer casino games and poker, but these products were not advertised externally and were typically utilized by current sports betting customers.  *See* bwin Annual Report 2005 at 24.
[78] *See id.*
[79] bwin Ad-hoc press release: Q2 & first half of 2006 at 7.
[80] *See, e.g.*, Complaint, ¶¶ 103-109.

Subsequent to the Ongame acquisition, bwin offered poker and casino games to U.S.-based customers, but, as noted above, a bwin press release from August 2006 (five months after the Ongame acquisition) disclosed that it did not offer sports betting products to U.S. citizens.[81]

### Detention of bwin Executives

On September 15, 2006, the co-Chief Executive Officers of bwin, Manfred Bodner and Norbert Teufelberger, were detained in France for allegedly violating French gaming laws that prohibited acceptance of bets by entities other than the French state-owned monopolies.[82] bwin stock was temporarily suspended from trading that day.[83] (According to recent press, the case stood dormant for years, and, in April 2014, both Bodner and Teufelberger were acquitted of the charges.)[84]

Within the ten days following the detentions in France, International Discovery liquidated its remaining holdings in bwin, in three separate trades that occurred on September 21, 22, and 25 (with settlement dates of September 26, 27, and 28, respectively).[85] As International Discovery portfolio managers Mr. Brady and Mr. Kopinski explained, the actions in France were the motivating factor behind the liquidation of the bwin investment.[86] Mr. Brady and Kopinski explained that they had focused on bwin's operations in Europe and that, when legal and regulatory problems arose in Europe that impacted the stock directly, it was time to sell the stock.

### Anti-Gambling Legislation

From the late 1990s through 2006, multiple bills were introduced in Congress to prohibit internet gambling via different mechanisms. By the end of 2005, Senator Jon Kyl had introduced eight different bills, each of which had failed.[87] In February 2006 alone, there were three different current bills that had been introduced in Congress aimed at prohibiting internet gaming.[88] The numerous attempts to prohibit or regulate internet gambling reflect the uncertainty of the existing regulatory scheme at the time and lend support to the view that existing statutes did not comprehensively prohibit internet gambling.

---

[81] bwin Ad-hoc press release: Q2 & first half of 2006 at 7.
[82] *See, e.g.*, David Gow & Simon Bowers, *Online gambling bosses arrested in France*, THE GUARDIAN, Sept. 15, 2006, http://www.theguardian.com/business/2006/sep/16/ austria.gambling.
[83] LSBD_CTRL_00006891.
[84] *Teufelberger and Bodner acquitted of French monopoly violations*, GAMING INTELLIGENCE, May 19, 2014, http://www.gamingintelligence.com/legal/25953-teufelberger-and-bodner-acquitted-of-french-monopoly-violations.
[85] *See*, supra, Section V.B.
[86] Appendix A, Summaries of Mr. Brady and Mr. Kopinski's Interviews.
[87] *See* LSBD_CTRL_00037461.
[88] *See* LSBD_CTRL_00043965. A comprehensive discussion of the pending bills in February 2006 is set forth in a Morgan Stanley report that was distributed to International Discovery portfolio managers and analysts. LSBD_CTRL_00045435.

39

On September 29, 2006, Congress passed the Unlawful Internet Gambling Enforcement Act ("UIGEA"),[89] which was included as a rider to the Security and Accountability for Every Port Act of 2006 ("SAFE Port Act"). President Bush signed the Act into law on October 13, 2006.[90] The primary effect of the UIGEA was to prohibit financial institutions and payment processing companies from knowingly accepting funds related to "unlawful Internet gambling."[91] The statute does not outlaw internet gambling by U.S. citizens, nor does it specify what types of bets (*i.e.*, poker, casino) constitute "unlawful internet gambling." Noteworthy is the following statement of Congress in the "Findings" section of the statute: "New mechanisms for enforcing gambling laws on the Internet are necessary because traditional law enforcement mechanisms are often inadequate for enforcing gambling prohibitions or regulations on the Internet, especially where such gambling crosses State or national borders."[92]

As noted above, International Discovery sold all of its shares in bwin prior to the date when the UIGEA was passed in Congress. Thus, the passage of the UIGEA is of marginal relevance to International Discovery's bwin investments, other than (1) to demonstrate the uncertainty of the applicability of existing statutes to internet gambling, and (2) to support the statements by International Discovery employees that the investments in bwin (and ultimate sales of the stock) were dictated by the stock's performance in the European markets and with non-U.S. customers.[93]

### Conclusion

The Special Subcommittee concludes that bwin was not violating any U.S. laws during the time International Discovery was invested in bwin in 2006. bwin's public disclosures indicate that the company did not accept sports bets from U.S. customers, and the Special Subcommittee has seen no evidence to indicate otherwise.

On acquiring Ongame in March 2006, bwin apparently began offering internet betting on poker and casino games to U.S. customers. As discussed above, no federal court had found internet poker and casino betting to violate any federal criminal statutes (such as 18 U.S.C. Section 1955), and one federal court had specifically excluded it from the applicability of the Wire Act. Similarly, the enforcement efforts by the Department of Justice through the 2006 time frame involved individuals and companies that took bets on sports through the internet and phone. As reflected in multiple analyst reports and articles in the press during the 2005 and 2006 time frame, internet poker and casinos operated in a grey area. Ultimately, in October 2006, the passage of the UIGEA ended this confusion, not by criminalizing betting on internet poker or casinos, but by prohibiting financial transactions that allowed for such wagers to be placed. Thus, the Special Subcommittee finds that, by offering internet poker and casino betting to U.S. customers in the January (or, more specifically, March) – September, 2006 time frame, bwin was not violating any federal U.S. laws.

---

[89] H.R. 4954, 109th Cong. (2006).
[90] SAFE Port Act, Pub. L. 109-347, 120 Stat. 1884.
[91] 31 U.S.C. Section 5363.
[92] 31 U.S.C. Section 5361(a)(4).
[93] Appendix A, Summaries of Mr. Brady and Mr. Han's Interviews.

40

**C.     Issue Two: Did International Discovery Violate 18 U.S.C. Section 1955 by Investing in bwin?**

As previously discussed, the Special Subcommittee is unaware of any court that, in 2006 or earlier, held that internet poker and casino games violated any federal statutes.  Nor is it aware of any federal court that found that internet poker and casino games constituted an "illegal gambling business" under 18 U.S.C. Section 1955.

In the meeting between counsel for the Special Subcommittee and Mr. Gomes, counsel for Mr. Gomes advanced the following theory:  Because certain states had found internet casino games to be illegal under their laws (*e.g.,* Missouri and New York),[94] a company operating such a business would constitute an "illegal gambling business" under Section 1955.[95]  Because International Discovery then purchased shares of such a company (bwin), and because purchasing shares is the only way that you can own part of a corporation, International Discovery then "own[ed] all or part of an illegal gambling business," in violation of Section 1955.  This alleged violation of Section 1955 serves as the predicate act for the RICO claims as well as the basis for the state law claims.

This theory has been asserted by Mr. Gomes' counsel in multiple other derivative complaints against mutual funds.  Such a theory has never been successful, and the courts addressing the issue—both state and federal—have consistently held that no legal support exists for this theory.  As to plaintiff's counsel's repeated assertions of this theory, one federal district judge noted: "Plaintiff's counsel has a rather dubious history of filing similar complaints based on the same basic theory in both federal and state courts around the country.  Those actions, although involving different parties, were all equally unavailing."[96]  The judge also explained that plaintiff had "failed to cite any case, or indeed any convincing authority, in support of those arguments.  In fact, several courts have held otherwise."[97]

Similarly, the Delaware Chancery Court, in dismissing a similar complaint by plaintiff's counsel, explained:

> The history of the application of Section 1955 shows that Plaintiff's interpretation of it is anything but clear and unambiguous.  Despite having been enacted more than forty years ago and the fact that U.S. investors have been able to passively invest as stockholders in offshore gambling enterprises since the

---

[94] *See Nixon*, 1997 WL 33545763; *Vacco*, 714 N.Y.S. 2d at 861-63 (both discussed *supra* Section VII.B.).

[95] Section 1955 defines an "illegal gambling business" as a gambling business which "is a violation of the law of a state or political subdivision in which it is conducted."  18 U.S.C. Section 1955(b)(1)(i).

[96] *Gamoran v. Neuberger Berman, LLC*, No. 11 Civ. 07957(TPG), 2013 WL 1286133, at n.1 (S.D.N.Y. March 29, 2013).

[97] *Id.* at *4 (*citing McBrearty v. Vanguard Group, Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. April 2, 2009); *Seidl v. Am. Century Co.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010)).

mid 2000s, the Complaint contains no allegation that any law enforcement authority or court has interpreted Section 1955 to apply to passive public stockholders. Nor have Plaintiffs directed the Court to any instances where government regulatory or law enforcement agencies have brought charges against passive stockholders under Section 1955.[98]

This trend has continued. When counsel for Mr. Gomes filed his initial complaint in this matter, Judge Wright, a United States District Court judge in Kansas City, Missouri, dismissed the complaint *with prejudice*, succinctly explaining how courts have treated plaintiff's legal theory to date:

The legal issues in this case have been litigated and decided by several courts around the country. To date, no court has found merit to any of the claims presented by plaintiff's counsel, and the Court can find no reason why the claims here should fare any better.[99]

*Conclusion*

Based on the lack of any case law supporting plaintiff's theory and the multiple courts that have rejected this exact theory, the Special Subcommittee concludes International Discovery's passive investments in bwin (and Neteller) did not constitute a violation of 18 U.S.C. Section 1955.

**D.     Issue Three: Did International Discovery or Any of Its Agents Believe that Purchasing bwin Shares Violated 18 U.S.C. Section 1955?**

As discussed in Section VII.C., *supra*, the Special Subcommittee set out to determine if International Discovery violated Section 1955 by investing in bwin, and, if so, if any of the individuals making the investments knew or believed that investing in the company violated Section 1955 or any other statute. As noted, the Special Subcommittee has concluded both that bwin was not in violation of any federal statutes during the relevant time period and that International Discovery did not violate 18 U.S.C. Section 1955 by investing in bwin. Therefore, the analysis need not proceed to this step. Nevertheless, as part of its investigation and analysis, the Special Subcommittee did conduct an inquiry into whether the individuals responsible for International Discovery's investment decisions regarding bwin knew, believed, or had reason to know or believe that the investment in bwin potentially violated any criminal laws.

In summary, based on a comprehensive email review, followed by in-person interviews, the Special Subcommittee determined that the individuals at International Discovery responsible for the bwin investment decisions (portfolio managers Mr. Brady and Mr. Kopinski and analyst

---

[98] *Hartsel v. Vanguard Group,* CIV.A.5394-VCP, 2011 WL 2421003 (Del. Ch. June 15, 2011).
[99] *Gomes v. Am. Century Cos.*, No. 10-0083-CV-W-SOW, 2012 WL 10831065, at *1 (W.D. Mo. Feb. 16, 2012).

Mr. Han) did not know or believe, and had no valid reason to know or believe, that there was anything improper, let alone illegal, about investing in bwin.

As detailed in the chronology (and as discussed in Section VII.B., *supra*), the emails and reports received by International Discovery personnel highlighted the lack of clarity regarding the legality of internet gambling. The only documents that firmly asserted that online gaming other than sports betting (namely, poker and casino games) was illegal were those sent by UBS analyst Will Robins to Mr. Brady and Mr. Kopinski. Mr. Kopinski did not remember the specific emails, but he recalled Mr. Robins as being "flamboyant" and "outspoken." Mr. Brady generally recalled Mr. Robins' opinions at the time but noted that he did not pay much attention to them because Mr. Robins was not a lawyer and had no legal expertise. Both Mr. Kopinski and Mr. Brady explained that emails such as these were typical from a broker like Mr. Robins, as brokers make money based on trading activity and are therefore, incentivized to motivate investors to buy or sell stocks.

International Discovery personnel also received emails relating to DOJ enforcement efforts, including the arrest of the Betonsports CEO in July 2006. They were aware that bwin's business, like that of Betonsports, was focused on sports betting. From a legal perspective, this did not concern International Discovery personnel, as they all believed that bwin was a European online sports betting site and that it did not accept bets from customers in the U.S. The Special Subcommittee confirmed the reasonableness of this belief by reviewing bwin's public disclosures, which included a specific representation that the company did not accept sports bets from U.S. customers.[100] As Mr. Kopinski explained, this was consistent with the investment goals and targets of the International Discovery, as it focused on investing in small- and mid-cap companies located in Europe and with their primary operations in Europe and not on companies whose operations or customer bases were centered in the U.S. The timing of the Fund's liquidation of its bwin holdings also was consistent with this view, as International Discovery sold all of its shares once it realized that there may be legal or regulatory troubles in Europe— where its key operations were focused—after the detention of the bwin executives in France in mid-September 2006.

International Discovery personnel provided several additional reasons why they believed the bwin investment was entirely appropriate. Messrs. Brady, Han, and Kopinski all explained that they believed ACWMF's "compliance filters" would prevent any illegal or impermissible investments. If a trade is prohibited, which can occur for a variety of reasons (*e.g.*, outside of fund's investment scope, exceeds certain volume ownership parameters, company is located in certain countries), the trade is rejected after it is entered in the trading system (called "Purchase Order Manager" or "PO Manager"). Mr. Brady gave the example of investments that would be prohibited by the Office of Foreign Asset Control (or "OFAC"), which makes it illegal to invest in companies that are located in certain countries. And Mr. Brady explained that the compliance filters would kick back any orders to purchase securities of companies on the OFAC list.

---

[100] bwin Ad-hoc press release: Q2 & first half of 2006 at 7.

International Discovery personnel understood that the ACWMF's Compliance Department implemented and monitored these compliance filters.[101]

International Discovery personnel took comfort in two additional facts: (1) that bwin's shares were listed and available for purchase on a public exchange, and (2) that, at the time, bwin was included in the benchmark against which International Discovery's performance was measured, the S&P/Citi EMI World Growth ex-U.S index. They did not believe that an "illegal" company would be included on an index of a major U.S. bank. The Special Subcommittee confirmed that bwin was on the referenced index during the relevant time period.[102]

Messrs. Brady, Kopinski, and Han each clearly stated that, had they known or had anyone indicated that International Discovery might be breaking a law by investing in bwin (or Neteller), they never would have made such investments. As Mr. Brady explained, there would have been no reason to take such a risk, as there were many other potential investments that did not carry that risk.

While International Discovery personnel uniformly believed that there was no legal risk in investing in bwin and Neteller, they did recognize that there was an investment risk. As Mr. Kopinski explained, the entire industry was awaiting clarity on the legal and regulatory status of internet gambling, and the primary issue was if Congress would act, and, if so, if it would outlaw internet gambling or permit it but regulate it is to U.S. customers. The potential risk of regulation existed in other countries also. Because of these inherent risks, as Mr. Kopinski explained, International Discovery made only "modest" investments in bwin and Neteller, each of which he estimated was never more than one percent of the Fund's holdings.[103]

## E.  Issue Four: Is It in the Best Interests of ACWMF to Pursue Any of the Claims Set Forth in Mr. Gomes' Complaint or Any Related Claims Not Pleaded in the Complaint?

The final issue that the Special Subcommittee addressed is the overarching issue in any derivative action: whether pursuing the demanded litigation is in the best interests of the corporation.[104]

---

[101] Ms. Christine Rolli, Senior Manager in ACWMF's Compliance Department, confirmed the existence of such filters. She further confirmed that no compliance filter existed at the time that would have prohibited an investment in bwin, nor was there any suggestion or indication at that time that any such filter should be in place.

[102] S&P/Citi EMI World Growth ex-U.S Index, Dec. 31, 2005; Sept. 30, 2006.

[103] The Subcommittee confirmed that, during the time that International Discovery held shares in these two companies, bwin constituted between .04% and .91% of International Discovery's value and Neteller constituted between .03 percent and .83% of International Discovery's value.

[104] *See Shenker v. Laureate Educ.*, 411 Md. 317, 344 (2009); *Bender v. Schwartz*, 172 Md. App. 648, 666 (2007).

44

*Likelihood of Success on the Merits*

Mr. Gomes asserts multiple claims in his complaint, all of which are premised, in some way, on the allegation that International Discovery invested in "illegal gambling businesses" or "unlawful gambling organizations." The Special Subcommittee assessed these claims in light of the factual findings set forth above.

Additionally, in assessing the roles and actions of the individual defendants named by Mr. Gomes in his complaint, the Special Subcommittee determined that the members of the ACWMF Board named in the complaint had no knowledge of, nor any role in approving, the bwin and Neteller investments by International Discovery. Nor should they have. It would be unrealistic to believe that ACWMF Board members would be aware of, and have to approve, each investment made by each fund issued by ACWMF. Accordingly, even under Mr. Gomes' theory that International Discovery invested in "illegal gambling businesses," the ACWMF Board members, who took no board action relating to these investments and, in fact, were not even aware of these specific investments, would not be appropriate defendants.

## Civil RICO (Counts 1 and 2)

Mr. Gomes' civil RICO claims, alleging violations of 18 U.S.C. Sections 1962(c) and (d), are premised on the allegation that International Discovery "owned part of illegal gambling businesses in violation of Section 1955."[105] Per the civil RICO statute, a violation of Section 1955 can serve as the "predicate act" that constitutes "racketeering activity," as defined in 18 U.S.C. Section 1961(1).

As detailed above, based on relevant case law and the facts acquired during its investigation, the Special Subcommittee has concluded that International Discovery and its agents did not violate Section 1955 by investing in bwin and/or Neteller. Likewise, the Special Subcommittee found no evidence that International Discovery or any of its agents conspired in any way to violate the statute. Moreover, as to Neteller, because of the lack of injury suffered by ACWMF or any of its investors due to the net gain on that investment, there exists little likelihood that one could satisfy the required elements of injury, causation, and proximate causation.[106]

Lacking a violation of Section 1955, the predicate act as alleged by Mr. Gomes, proof of which is an essential element of a civil RICO claim, there is little likelihood that the civil RICO claims asserted in Counts 1 and 2 would succeed on the merits.

In addition, as Judge Smith stated in his order staying the case to allow the Special Subcommittee to conduct its investigation, "[t]here is significant overlap in issues between Seidl and the present case."[107] Indeed, "[t]here is a significant amount of investigative work and

---

[105] Complaint, ¶¶ 188, 195.
[106] *See, e.g.*, *Hemi Group v. New York*, 559 U.S. 1, 9 (2010).
[107] Order Granting Defendants' Motion to Stay and Setting Deadline for Filing of Joint Proposed Scheduling Order, *Gomes v. Am. Century Cos., Inc.*, No. 4:14-cv-00283-ODS [Doc. 23] (W.D. Mo. July 1, 2014).

45

analysis that has already been performed."[108]  With that in mind, the Special Subcommittee notes that the committee which investigated the *Seidl* matter conducted an extensive legal analysis of the viability of Ms. Seidl's similar RICO claims.  And its report enumerated various reasons why those claims are not likely to succeed on the merits, including: 1) a passive investment does not appear to satisfy the "pattern of racketeering activity" element required by RICO; 2) the fund making the investment was not "associated with" an "enterprise" engaged in racketeering activity; 3) the fund did not "conduct or participate" in the conduct of a gambling enterprise; and 4) the investment in an online gaming security is not the proximate cause of alleged RICO injury.[109]  That legal analysis applies equally to Mr. Gomes' RICO claims and further supports the Special Subcommittee's conclusion that his claims are not likely to succeed on the merits.

**Common Law Claims (Counts 3-6: Breach of Fiduciary Duty, Negligence, Waste, Breach of Contract)**

In Counts 3-6, Mr. Gomes asserts various common law claims, each of which is premised on the allegation that International Discovery invested in, and certain defendants caused International Discovery to invest in, "illegal gambling businesses."  Because the claims are asserted against various groups of defendants, including corporate defendants, members of the ACWMF Board, certain senior executives, and individual associated with International Discovery and/or ACIM, this analysis would typically separate discussion regarding the potential liability of each category of defendants.  But, because the Special Subcommittee has determined that the underlying premise of each of these claims—that International Discovery invested in illegal gambling businesses—is not accurate, these claims and their potential validity as to all named defendants can be addressed together.

Breach of Fiduciary Duty (Count 3) and Negligence (Count 4)

Contrary to Mr. Gomes' allegations, the Special Subcommittee determined that International Discovery did not invest in any "illegal gambling businesses."  Because the legal predicate of Mr. Gomes' claim cannot be established, the Special Subcommittee concludes that neither of these claims would likely succeed on the merits.

In addition, based on an extensive review and analysis of the factual record, the Special Subcommittee concludes that the defendants did not breach their fiduciary duties or duties that would give rise to a cause of action in negligence.[110]  The ACWMF Board exercised the appropriate level of oversight on ACIM and International Discovery.  And there is no evidence that it failed to fulfill its duties loyally and diligently.  Likewise, the other non-director defendants fulfilled their duties to ACWMF—to the extent they were involved in the purchase of Neteller and bwin at all—because they appropriately identified Neteller and bwin as stocks meeting the regulatory parameters and criteria for International Discovery; they did not believe that the investments violated U.S. federal law; they monitored the investments; and then sold the

---

[108] *Id.*
[109] *Seidl* Special Litigation Committee Report at 52-58.
[110] The *Seidl* Special Litigation Committee Report extensively describes that duties owed by all defendants in their report. *Seidl* Special Litigation Committee Report at 59-63 & 67-71. They thus need not be repeated here.

securities when events signaled that the securities would no longer contribute to International Discovery's objectives. And in the case of Neteller, the stock was sold for a significant gain. In short, the facts do not support these claims.

Waste (Count 5)

Mr. Gomes' "waste" claim is premised on the allegation that using Fund assets "to illegally purchase shares of unlawful gambling organizations constitutes a waste of assets."[111] As detailed above, the Special Subcommittee concluded that International Discovery's investment was not illegal and that Neteller and bwin were not "unlawful gambling organizations" at the time of the investments. International Discovery's investments, therefore, did not constitute "[u]se of corporate assets in violation of federal and state criminal laws,"[112] leading the Special Subcommittee to conclude that the waste claim is not likely to succeed on the merits.

What is more, the investments in Neteller and bwin do not present a situation in which "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid."[113] In each purchase and sale of Neteller and bwin shares on a public exchange, International Discovery received something of value. There was no irrational squandering of corporate assets.[114] And again International Discovery's investment in Neteller made a significant return. In short, there is no evidence that the defendants wasted corporate assets and, therefore, this claim is unlikely to succeed on the merits.

Breach of Contract (Count 6)

Mr. Gomes' breach of contract claim alleges that ACIM, which was the investment advisor to ACWMF, breached the "Management Agreement" between the two parties by failing to adhere to the provision that required compliance with laws.[115] The alleged breach is premised on the allegation that ACIM breached the agreement by "causing the Fund to illegally purchase shares in Neteller and Bwin."[116] As discussed above, the Special Subcommittee has concluded that the Fund's investments in Neteller and bwin did not violate any laws. And as discussed below, ACIM's liability is limited by its management agreements with ACWMF. Thus, the breach of contract claim is unlikely to succeed on the merits.

---

[111] Complaint ¶ 212.
[112] Complaint ¶ 213.
[113] *Werbowsky v. Collomb*, 766 A.2d 123, 139 (Md. 2001).
[114] *White v. Panic*, 783 A.2d 543, 554 (Del. 2001) (holding that to show waste, a plaintiff must "show that the board irrationally squandered corporate assets—for example where the challenged transaction served no corporate purpose or where the corporation received no consideration at all").
[115] *See*, *e.g.*, American Century World Mutual Funds, Inc., Management Agreement, August 1, 2006, ¶ 2.
[116] Complaint ¶ 217.

47

*ACWMF's Obligation to Indemnify and Contractual Limitations on Liability*

Even if the facts supported bringing claims against the defendants acting as ACWMF directors or officers, ACWMF would likely be obligated to indemnify these defendants for defense costs, settlement amounts, or amounts paid on judgments. Indeed, under ACWMF's Articles of Incorporation:

> The Corporation shall indemnify to the full extent permitted by law each person who has served at any time as director or officer of the Corporation, and his heirs, administrators, successors and assigns, against any and all reasonable expenses, including counsel fees, amounts paid upon judgments, and amounts paid in settlement (before or after suit is commenced) actually incurred by such person in connection with the defense or settlement of any claim, action, suit or proceeding in which he is made a party, or which may be asserted against him, by reason of being or having been a director or officer of the Corporation. Such indemnification shall be in addition to any other rights to which such person may be entitled under any law, by-law, agreement, vote of stockholders, or otherwise.[117]

ACWMF could only recover against the defendants subject to this article if it proved that the defendants acted with willful misfeasance, bad faith, gross negligence, or the reckless disregard of their duties.[118] Because the factual record holds no support for these grosser offenses, ACWMF will almost certainly be required to indemnify these defendants if it pursued Mr. Gomes' claims.

ACWMF is also subject to provisions in it management agreements with ACIM that limit ACIM and possibly its employees' liability for acts or omissions made in the course of serving ACWMF. Specifically, these agreements state:

> In the absence of willful misfeasance, bad faith, gross negligence, or reckless disregard of its obligations or duties hereunder on the part of the Investment Manager, it, as an inducement to it to enter into this Agreement, shall not be subject to liability to the Company or to any shareholder of the Company for any act or omission in the course of, or connected with, rendering services hereunder or for any losses that may be sustained in the purchase, holding or sale of any security.[119]

Here, too, ACWMF would be required to prove facts that ACIM, and its employees, acted completely contrary to their obligations to ACWMF. The Special Subcommittee found no facts that would allow ACWMF to surmount this contractual hurdle.

---

[117] ACWMF Articles of Incorporation, Article 8 (December 27, 1990).
[118] *Id.*
[119] Amended and Restated Management Agreement, ¶ 12 (August 1, 2004); Amended and Restated Management Agreement, ¶ 12 (July 29, 2005); Amended and Restated Management Agreement, ¶ 12 (September 29, 2005); Management Agreement, ¶ 12 (August 1, 2006).

48

Both ACWMF's obligation to indemnify defendants and contractual provisions limiting other defendants' liability militate against initiating a suit on Mr. Gomes' claims. Thus, they provide additional support for the Special Subcommittee's conclusion that pursuing Mr. Gomes' claims is not in ACWMF's best interest.

### *Costs of Pursuing the Litigation*

If ACWMF pursued Mr. Gomes' claims, it would incur high costs. Indeed, the costs could likely outweigh any damages that ACWMF might recover after a prolonged and expensive process through the trial court and a likely appeal. To handle the litigation, ACWMF would be required to hire counsel from an outside law firm to draft and argue expensive motions (motions to dismiss or motions for judgment on the pleadings) at the initial stage of the case. If these motions were unsuccessful, ACWMF would likely spend significant additional sums through the discovery process to uncover evidence to support the claims. The summary judgment stage, and potentially trial, would force ACWMF to potentially spend hundreds of thousands of dollars more. And if the case were appealed to a federal appellate court, the total cost of pursuing the claims against the defendants could exceed $1 million. Because Mr. Gomes' claims are dubious, legally and factually, the Special Subcommittee believes that the uncertain benefits of pursuing the claims do not outweigh the clear costs.

# VIII. CONCLUSION

After months of independent investigation and extensive analysis of the claims made by Mr. Gomes, the Special Subcommittee believes that the ACWMF Board should not pursue any of the causes of action pleaded by Mr. Gomes or any other claims predicated on the allegations in his complaint. The Special Subcommittee recommends this course because it will serve ACWMF's best interests.

**MINUTES OF A SPECIAL MEETING OF THE**
**BOARD OF DIRECTORS OF**
**AMERICAN CENTURY WORLD MUTUAL FUNDS, INC.**

**December 9, 2014**

Pursuant to notice duly given, the Board of Directors (the "Board") of the American Century World Mutual Funds, Inc. ("ACWMF") held a special meeting (the "Meeting") on December 9, 2014 at 1:30 P.M., Central Time. The following Board members, representing all of the independent directors of the Board, were present: James A. Olson, Chairman; Thomas A. Brown; Andrea C. Hall; Jan M. Lewis; M. Jeannine Strandjord; John R. Whitten; and Stephen Yates. Also attending the Meeting were Barry Fink, a non-management director of ACWMF; Joseph Rebein and David Maria of Shook, Hardy & Bacon ("Shook Hardy"), counsel to the independent Special Subcommittee of the Board (the "Special Subcommittee" or "Subcommittee") formed to evaluate the demand by Mr. Nelson Gomes; and Marguerite C. Bateman and Victoria H. Pool of Schiff Hardin LLP, independent legal counsel to the Board. Mr. Olson served as Chairman of the Meeting and Ms. Bateman acted as Secretary.

Mr. Olson called the Meeting to order. He confirmed that the independent directors and non-management director (collectively, the "Directors") had received all relevant documents prior to the Meeting, including the Agenda for the Meeting, the Special Subcommittee Report dated December 1, 2014 (the "Report"), and the draft resolution of the Board relating to the recommendations of the Special Subcommittee. All Directors confirmed that they had received the documents listed.

**<u>Report and Recommendations of the Special Subcommittee</u>**

Mr. Olson indicated that the purpose of the Meeting was consideration of the Special Subcommittee Report. He noted that he had communicated with Jonathan Thomas, an interested director on the ACWMF board, prior to the Meeting and that Mr. Thomas said that he agreed with the recommendations in the Report insofar as they relate to the parties not currently affiliated with American Century Investment Management; with respect to all other parties, he abstained from expressing an opinion. He recused himself from the Meeting so that the Directors could discuss the recommendations with the Special Subcommittee. Mr. Olson called on Ms. Lewis, the Chairman of the Special Subcommittee, to discuss the Report and the recommendations to the Board in that Report.

Ms. Lewis began by reviewing the facts leading up to the appointment of the Special Subcommittee and the preparation of the Report. Among other facts, she noted:

- A derivative lawsuit was filed by ACWMF shareholder Mr. Gomes (the "Gomes Complaint"), purportedly on behalf of ACWMF, against American Century Companies, Inc., American Century Investment Management, Inc., James E. Stowers, Jr., James E. Stowers III, Thomas A. Brown, Andrea C. Hall, Donald H. Pratt, Gale E. Sayers, M. Jeannine Strandjord, Timothy S. Webster, William M. Lyons, Enrique Chang, Mark Kopinski and Brian Brady (collectively, "Defendants");

- Mr. Gomes' claims against the Defendants in the Derivative Litigation (the "Claims") arise out of the International Discovery Fund's investment in the stocks of NETeller plc and bwin Interactive Entertainment in 2005 and 2006, which he alleged were illegal off-shore internet gambling businesses. The Claims represent the second complaint on these facts instituted by Mr. Gomes; the first was dismissed with prejudice in February 2012;

- In April 2013, Mr. Gomes, through his attorney, served upon the Board a demand that it pursue the Claims against the Defendants. The Board did not act on the demand at that time because the parties were engaged in good faith negotiations to reach a Tolling and Standstill Agreement, an effort that was ultimately unsuccessful;

- In April 2014, the independent directors, in an action later ratified by the Board, resolved to appoint a Special Subcommittee consisting of independent directors Jan M. Lewis and Stephen E. Yates to investigate the Claims and to make a recommendation to the Board as to whether it would be in the best interests of ACWMF and its shareholders to pursue the Claims;

- The Special Subcommittee inquired into and confirmed its disinterestedness and independence with regard to the Claims;

- The Special Subcommittee conducted a search for qualified and independent legal counsel to advise and assist it in connection with the investigation, and, after interviewing several candidates, retained the law firm of Shook Hardy;

- The Special Subcommittee, with assistance from Shook Hardy, conducted a comprehensive investigation of the Claims, the facts underlying the Claims, and other potential bases for claims by ACWMF against the Defendants, which investigation included the review of thousands of documents; 22 interviews of named defendants and other relevant witnesses; meeting with Mr. Gomes' counsel; review of court documents in similar matters; meetings with counsel to review progress, discuss findings, receive guidance and give directions;

- One or both members of the Special Subcommittee personally reviewed relevant documents and personally participated in the interviews;

- Upon the conclusion of the investigation, the Special Subcommittee conferred at length with Shook Hardy about the facts, pertinent legal principles, the merits of the Claims, the costs and benefits of pursuing the Claims, and other considerations that are relevant to the best interests of ACWMF;

- The Special Subcommittee, with assistance from Shook Hardy, prepared a comprehensive Report detailing its findings, recommendations, and the bases for its recommendations; and

2

- The Special Subcommittee caused Shook Hardy to deliver the Subcommittee's Report and recommendations to the Board in advance of a Meeting to consider the Report and recommendations.

Ms. Lewis then introduced Mr. Rebein and Mr. Maria of Shook Hardy and asked that they review with the Directors the facts underlying the Gomes Complaint and the case law that was relied on in the Report. Mr. Rebein discussed the Claims and the Special Subcommittee's evaluation of the environment at the time of the investments by the International Discovery Fund. Mr. Maria then provided the Board a summary of the relevant case law pertaining to internet gambling, including the cases to which counsel for Mr. Gomes directed the Special Subcommittee. In discussing the *Gotti* case (discussed on page 35 of the Report), which applied 18 U.S.C. Section 1955, counsel noted that, while the sports bets in *Gotti* ultimately were transmitted through the Internet, the Court's focus in *Gotti* was the fact that the bets were physically placed in New York at the local branch of a sports book business. The bettors themselves were not placing sports bets via the Internet; accordingly, the Special Subcommittee interpreted *Gotti's* holding as not resolving the issues of "internet gambling," as reflected in the Report. Following this discussion, Ms. Lewis and Mr. Yates requested that the Report be supplemented to include the additional information on this case that was shared with the Directors during the Meeting. [Footnote 63 was added to the Report in response to this request.]

Ms. Lewis then reviewed the Special Subcommittee's findings and recommendations. She noted that, because the investment in NETeller resulted in a gain to investors, there was no harm so the Special Subcommittee did not consider there to be merit to the derivative claims related to this investment. In connection with the investment in bwin, she summarized the Special Subcommittee's findings:

- The Special Subcommittee concluded that there was insufficient support for a conclusion that there was a violation of U.S. law during the time the International Discovery Fund was invested in bwin shares in 2006.

- The Special Subcommittee found that the investment did not amount to an "illegal gambling business" under 18 U.S.C. 1955, because there was not any case law finding that a passive investment would violate the statute.

- The Special Subcommittee did not find evidence that the International Discovery Fund or any of its agents believed their purchases of bwin shares were in violation of 18 U.S.C. 1955.

- The Special Subcommittee believed there were a number of reasons that it would not be in the best interests of shareholders to pursue any of the Claims in the Gomes Complaint or any related claims not in the Complaint, including the likelihood of success by ACWMF on the merits and the various costs associated with litigation.

On behalf of the Special Subcommittee, Ms. Lewis formally recommended that the ACWMF Board not pursue any of the causes of action pleaded by Mr. Gomes or any other claims predicated on the allegations in his Complaint. Mr. Olson asked the Directors if anyone

3

had further questions about the Report itself or the recommendations of the Special Subcommittee. Following discussion, Mr. Olson presented the following resolution to the Directors:

> WHEREAS, the Subcommittee, with assistance from its independent legal counsel, has conducted a comprehensive investigation of Mr. Gomes' claims against the Defendants in the Derivative Litigation (the "Claims"), the facts underlying the Claims, and other potential bases for claims by ACWMF against the Defendants, which investigation included the review of thousands of documents; twenty-two (22) interviews of Defendants and other relevant witnesses; meeting with Mr. Gomes' counsel; review of relevant case law, including case law solicited from Mr. Gomes' counsel; review of court documents in similar matters; and frequent meetings with independent counsel to review progress, discuss findings, receive guidance and to give directions;

> WHEREAS, the Subcommittee, with assistance from its independent legal counsel, has prepared a comprehensive report detailing its findings, recommendations, and the bases for its recommendations;

> WHEREAS, the Subcommittee, with assistance from its independent legal counsel, has presented its report and recommendations to the Board at a special meeting and responded to all questions posed by members of the Board;

> WHEREAS, the Board, acting through a majority of its members, has considered the Subcommittee's report and recommendations, and other information presented by the Subcommittee and its counsel; the factual and legal merits of the Claims; the potential for recovering damages or other relief on behalf of ACWMF; the financial costs of prosecuting an action against the Defendants; the financial costs of potentially indemnifying certain Defendants for the costs of their defense; the potential operational costs that could be incurred by consuming personnel resources and diverting the attention of the directors, officers and employees of ACWMF and ACIM; other costs and benefits of pursuing the Claims; and the best interests of ACWMF and its shareholders; and

> WHEREAS, the Board accepts the Subcommittee's report and recommendations, and concludes that, in its judgment, pursuing the Claims asserted by Mr. Gomes, or any related claims, would be contrary to the best interests of ACWMF and its shareholders.

> RESOLVED THAT the Board will reject the demand of Mr. Gomes; and the Board will not pursue litigation or take other action with respect to the International Discovery Fund's investments in NETeller plc and bwin Interactive Entertainment AG, formerly BETandWIN.com Interactive Entertainment AG.

Mr. Olson requested a roll call vote on the resolution, which was approved unanimously. Mr. Olson then requested a separate vote on the resolution by all Directors who are not a party to the litigation initiated by Mr. Gomes (the "Non-Defendant Directors"). The vote by the Non-Defendant Directors was unanimous in support of the recommendation not to pursue the Claims

as reflected in the resolution. Mr. Olson thanked the Special Subcommittee and its counsel for their service to the Board.

There being no further business before the Board, the Meeting was adjourned at 3:00 P.M. Central Time.

Respectfully submitted,

Marguerite C. Bateman

39863-0004
DC\81117390.1

5